[This opinion has been published in *Ohio Official Reports* at 85 Ohio St.3d 433.]

THE STATE OF OHIO, APPELLEE, *v*. WHITE, APPELLANT.

[Cite as *State v. White*, 1999-Ohio-281.]

*Criminal law—Penalties and sentencing—Imposing sentence for aggravated murder—Victim-impact evidence admissible in capital sentencing hearings, when—Death penalty upheld, when.*

(No. 96-2853—Submitted September 28, 1998—Decided May 12, 1999.)

APPEAL from the Court of Common Pleas of Summit County, No. CR-96-01-0059.

———————————

{¶ 1} Appellant, Clifton "Sonny" White III, was convicted of the aggravated murder of Deborah Thorpe with death specifications. Defendant was sentenced to death for this crime and now appeals to this court as a matter of right.

{¶ 2} Defendant lived with his girlfriend, Heather Kawczk, at 615 Day Street, Akron. Once Kawczk moved in with him, defendant became extremely jealous and possessive and sometimes beat Kawczk. Kawczk decided to break up with defendant, but she had no place to live and was afraid of him.

{¶ 3} Kawczk worked at a Kentucky Fried Chicken ("KFC") restaurant on South Arlington Street, where one of her co-workers was Michael Thorpe, Jr. Kawczk and Thorpe began dating, and Kawczk told Thorpe that she wanted to leave defendant. Thorpe's mother, Deborah Thorpe, was a former co-worker of Kawczk's, as well as her close friend. Hearing of Kawczk's problem, Deborah Thorpe offered her a place to stay.

{¶ 4} On December 10, 1995, Deborah Thorpe and Kawczk drove to 615 Day Street while defendant was away and took Kawczk's clothes from the apartment. Distraught, two days later defendant repeatedly telephoned Kawczk,

apologizing and begging her to come back. Defendant continued to call Kawczk for several days.

{¶ 5} On the morning of Christmas Eve, around 11:00, defendant pulled up to the drive-through window at the KFC while Kawczk was working there. Defendant asked Kawczk whether she could come to his apartment and pick up the rest of her belongings. Kawczk said she could not, and defendant drove off.

{¶ 6} Later that day, defendant called Kawczk's mother, Julie Schrey. He asked Schrey to come to his apartment with Kawczk, since Kawczk did not want to come alone. Schrey then called Kawczk, who told Schrey that she "didn't want to go over there." Around 12:30 p.m., Schrey called again. She told Kawczk that she was about to go to the apartment with Deborah Thorpe to pick up Kawczk's belongings.

{¶ 7} That afternoon, after Schrey and Deborah Thorpe arrived at 615 Day Street, defendant killed them both with deer slugs fired from a 12-gauge pump shotgun.

{¶ 8} About forty-five minutes after Kawczk's last conversation with Deborah Thorpe, defendant walked into the KFC and told Kawczk he had some of her things in the car. Kawczk refused to accompany defendant to his car.

{¶ 9} A few minutes later, defendant came back into the restaurant, shotgun in hand. He vaulted over the counter, ran toward Kawczk, pointed the gun at her, and pumped it. At this point, Michael Thorpe confronted defendant, telling him several times to leave. Defendant responded by shooting Thorpe in the head, and then he fled. Thorpe survived the shooting but lost most of his right ear, part of his skull, and the right upper lobe of his brain.

{¶ 10} Later that day, defendant told a friend of his that "I messed up really bad * * * [.] I shot three people." Defendant called 911 to report the shootings. He then got another friend to drive him to the Akron police station. Defendant told the desk officer at the station, "I done something bad. I just killed a guy at KFC."

Defendant also asked for an ambulance at 615 Day Street because "I shot two people over there."

{¶ 11} Defendant then spoke to Detective Lawrence McCain. He told Detective McCain that the two women at the apartment were trying to talk him out of committing suicide when his gun "went off," killing Schrey. He said that he then shot Deborah Thorpe because "he didn't want her to have to live with the thought of seeing her friend killed." As for Michael Thorpe, defendant said Thorpe "got in the way" and his gun "went off again." Defendant later told the same story, in more detail, to Akron Police Captain Paul Callahan and Lieutenant Robert Offret.

{¶ 12} The Summit County Grand Jury indicted defendant on two counts of aggravated murder, R.C. 2903.01(A) (prior calculation and design), and one count of attempted aggravated murder. (Two other counts were dismissed before trial.) Count One (aggravated murder of Julie Schrey) and Count Two (aggravated murder of Deborah Thorpe) each carried a course-of-conduct specification under R.C. 2929.04(A)(5); Count Two also carried a specification under R.C. 2929.04(A)(3) (murder for purpose of escaping detection, apprehension, trial, or punishment for another crime). Each count had a firearm specification under R.C. 2941.141.

{¶ 13} On Count One, the jury convicted defendant of the lesser-included offense of murder. On Count Two, the jury convicted defendant of aggravated murder and of both death specifications. The jury also convicted defendant of the lesser-included offense of attempted aggravated murder on Count Three, and all firearm specifications.

{¶ 14} Following a mitigation hearing, the court sentenced defendant to terms of imprisonment on the murder and attempted murder convictions, and imposed the sentence of death on the aggravated murder conviction.

**{¶ 15}** Defendant attempted to appeal the judgment to the Court of Appeals for Summit County, which dismissed the appeal for want of jurisdiction.[1] Simultaneously, defendant appealed the conviction and sentence directly to this court as a matter of right, pursuant to Section 2, Article IV, Ohio Constitution.

---

*Michael T. Callahan*, Summit County Prosecuting Attorney, and *Philip D. Bogdanoff*, Assistant Prosecuting Attorney, for appellee.

*Annette L. Powers* and *Renee W. Green*, for appellant.

---

**LUNDBERG STRATTON, J.**

**{¶ 16}** We have reviewed defendant's propositions of law, independently weighed the evidence relating to the death sentence, weighed the aggravating circumstances against the mitigating factors, and compared the sentence with sentences in similar capital cases. As a result, we affirm defendant's convictions and death sentence.

## I. *BATSON* ISSUE

**{¶ 17}** At trial, defendant objected to the state's peremptory challenge of prospective juror Jesse Dent, arguing that the state challenged Dent because Dent was black, in violation of the Fourteenth Amendment. See *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. After the state explained its reasons for striking Dent, the trial court overruled defendant's objection. In his fifth proposition of law, defendant contends that the trial court erred.

**{¶ 18}** *Batson* establishes a three-step procedure for evaluating claims of racial discrimination in peremptory strikes. First, the opponent of the strike must make a prima facie showing of discrimination. Second, the proponent must give a

---

1. Defendant also appealed that dismissal to this court. We consolidated that appeal, case No. 97-1001, with the instant case. 79 Ohio St.3d 1401, 679 N.E.2d 718. Subsequently, we dismissed case No. 97-1001 for want of prosecution. See 80 Ohio St.3d 1452, 686 N.E.2d 524.

race-neutral explanation for the challenge. Third, the trial court must determine whether, under all the circumstances, the opponent has proven purposeful racial discrimination. *Id.* at 96-98, 106 S.Ct. at 1723-1724, 90 L.Ed.2d at 87-89; *Purkett v. Elem* (1995), 514 U.S. 765, 767-768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839; *State v. Hernandez* (1992), 63 Ohio St.3d 577, 582, 589 N.E.2d 1310, 1313-1314.

{¶ 19} At oral argument, the state contended that in order to prevail on a *Batson* claim, a defendant must show the existence of a pattern of peremptory challenges by the state against members of the group in question. Inasmuch as Dent was the only black prospective juror on whom the state used a peremptory challenge, the state argues that there was no pattern, and hence no *Batson* violation.

{¶ 20} We reject this view, for "the exercise of *even one* peremptory challenge in a purposefully discriminatory manner would violate equal protection." (Emphasis added.) *State v. Ellison* (Tenn.1992), 841 S.W.2d 824, 827. " 'A single invidiously discriminatory act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.' " *Batson*, 476 U.S. at 95, 106 S.Ct. at 1722, 90 L.Ed.2d at 87, quoting *Arlington Hts. v. Metro. Hous. Dev. Corp.* (1977), 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450, 465, fn. 14.

{¶ 21} The existence of a pattern of discriminatory strikes is *not* a prerequisite either to finding a prima facie case in step one of the *Batson* analysis or to finding actual discrimination in step three. Such a rule would ignore *Batson*'s requirement that the trial court consider *all* the circumstances in determining whether racial discrimination occurred. It would also mean that no *Batson* challenge could succeed unless the prosecutor challenged more than one member of the group in question. Such a rule would license prosecutors to exercise one illegal peremptory strike per trial. The law of equal protection does not allow "one free bite."

**{¶ 22}** Thus, the mere fact that the state challenged only one black prospective juror does not preclude a *Batson* challenge. See *United States v. Battle* (C.A.8, 1987), 836 F.2d 1084, 1086.

**{¶ 23}** The state also contends that defendant failed to make a prima facie case of purposeful discrimination. We need not consider this question. At trial, the state gave its reason for challenging Dent, even though the trial court neither ordered the state to do so nor found that a prima facie case existed. Once the proponent explains the challenge and the trial court rules on the ultimate issue of discrimination, whether or not a prima facie case was established becomes moot. *Hernandez v. New York* (1991), 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 405; *State v. Hernandez*, 63 Ohio St.3d at 583, 589 N.E.2d at 1314.

**{¶ 24}** Thus, the *Batson* analysis moves to the second step: whether the state supplied a race-neutral explanation. The prosecutor told the trial court that he removed Dent because Dent opposed capital punishment. This is a race-neutral explanation. Defendant argues that it is nevertheless an invalid explanation because Dent said that he would put his feelings aside and follow the law. But defendant's argument misconceives the nature of a *Batson* claim. The only issue in step two of the *Batson* analysis is whether the proponent gave a *race-neutral* explanation for his peremptory challenge. The "explanation need not rise to the level of justifying exercise of a challenge for cause." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. See, also, *Purkett,* 514 U.S. at 769, 115 S.Ct. at 1771, 131 L.Ed.2d at 839. While a prospective juror's answers may be sufficient to survive a challenge for cause, both prosecutors and defense attorneys must remain free to challenge on a peremptory basis jurors whose answers create overall concerns on the subject at issue.

**{¶ 25}** Finally, step three asks whether, in light of all the circumstances, the state did, in fact, have a discriminatory motive for striking the juror. The burden of persuasion always stays with the opponent of the strike. *Purkett,* 514 U.S. at

768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839.  The trial court's finding is entitled to deference, since it turns largely "on evaluation of credibility."  *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21.

{¶ 26} The facts in this case support the state's explanation.  Dent did say that he opposed the death penalty, had been against it for over five years, and just did not believe in the death penalty.  In fact, he initially said that his beliefs would prevent or substantially impair his ability to find the defendant guilty (although he later appeared to change his mind).

{¶ 27} Other facts also point away from a racial motivation.  The state "did not attempt to exclude all blacks, or as many blacks as it could, from the jury." *United States v. Montgomery* (C.A.8, 1987), 819 F.2d 847, 851.  When the defense challenged a black prospective juror because she was a deputy sheriff, the state argued vigorously in favor of *keeping* that juror.

{¶ 28} Moreover, the state did not use a peremptory challenge on prospective juror John A. Rucker, who was black.  The state, in fact,  waived its last two peremptories and proclaimed itself satisfied with the jury, including Rucker.  Since the defense had just waived a peremptory, the prosecutors knew that Rucker would be on the jury as a result.  The presence of one or more black persons on a jury certainly does not *preclude* a finding of discrimination, but "the fact may be taken into account * * * as one that suggests that the government did not seek to rid the jury of persons [of a particular] race."  *United States v. Young-Bey* (C.A.8, 1990), 893 F.2d 178, 180.  See, also, *United States v. Canoy* (C.A.7, 1994), 38 F.3d 893, 900-901 (citing cases).

{¶ 29} Defendant cites the state's challenges for cause of two black prospective jurors, Carolyn A. Howard and James M. Stafford, as showing the prosecutors' discriminatory intent.  However, both challenges were well supported by the record, and both were upheld by the trial court.  One of those prospective jurors strongly opposed capital punishment.  The other asked to be excused because

she needed to baby-sit her grandchildren during her son's honeymoon; the state did not actually challenge her, but merely supported her request. The state's actions with respect to these jurors do not remotely suggest any racial motivation.

{¶ 30} On this record, the trial court reasonably found that defendant did not carry his burden of persuasion. Indeed, defendant points to no prosecutorial act or statement during voir dire that supports an inference of racial motivation. Hence, he shows no basis to disturb the trial court's ruling. His fifth proposition is overruled.

## II. CHALLENGE FOR CAUSE

{¶ 31} In his sixth proposition of law, defendant contends that the excusal for cause of prospective juror Stafford violated *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. Under *Witt*, a prospective juror may not be excused for cause due to his opinions on capital punishment unless his views would prevent or substantially impair the performance of his duties in accordance with his instructions and oath. *Id.* at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851-852.

{¶ 32} Stafford began by stating that he had opposed capital punishment since the end of the Vietnam War. The trial judge asked: "Would your view * * * prevent or substantially impair your finding the defendant guilty if the evidence and the law so warrant it because the death penalty could be imposed?" Stafford said: "I don't know * * * [.] I have never been tested." Asked whether he could follow the law if that entailed recommending death, Stafford said it would be "difficult."

{¶ 33} After defense counsel examined Stafford, Stafford said, "I think I can follow the Court's instructions." However, the judge then asked: "Would your present views * * * prevent or substantially impair your finding the defendant guilty if the evidence and the law so warranted because the death penalty could be imposed?" Stafford replied: "[I]t seems like the answer should be *yes*. It seems to me that my answer should be *yes*." (Emphasis added.)

8

**{¶ 34}** Later, Stafford appeared to contradict his earlier statements: "I am really struggling with that * * *. I am going to say that—yes, yes, I can do that." The trial judge noted Stafford's indecisiveness and found that Stafford's views would "substantially impair his ability to render a fair and impartial judgment."

**{¶ 35}** The record supports this finding. Stafford's voir dire reflects a sincere, conscientious citizen, but one who agonized over whether he could follow the law if it conflicted with his strong ethical beliefs opposing the death penalty. Most important, when asked whether his views would prevent or substantially impair his ability to find White guilty if the evidence and law so warranted, Stafford appeared to say "yes."

**{¶ 36}** White argues that Stafford's "clear conclusion" was that he could follow the law. But when a prospective juror makes what appear to be contradictory statements on voir dire, as Stafford did, it is for the trial court to decide which statements to believe. The issue is not conclusively determined by whatever the prospective juror happens to say last. See, *e.g., State v. Scott* (1986), 26 Ohio St.3d 92, 97-98, 26 OBR 79, 83-84, 497 N.E.2d 55, 60-61.

**{¶ 37}** Stafford apparently admitted that his views could prevent or impair his finding defendant guilty, even if the evidence and the law so warranted. Basing its ruling on Stafford's demeanor, as well as his words, the trial court found that Stafford's views would substantially impair his ability to render a fair, impartial verdict.

**{¶ 38}** A reviewing court must defer to the trial court's findings regarding bias if the record fairly supports those findings. *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 414, 280 N.E.2d 915, 920. On this record, we can see no basis to second-guess the trial court's finding as to Stafford. We therefore overrule defendant's sixth proposition of law.

### III. PROSECUTORIAL MISCONDUCT

**{¶ 39}** Michael Thorpe testified for the state in the guilt phase, with Assistant Prosecuting Attorney Michael E. Carroll conducting his direct examination. As Thorpe testified, Carroll's co-counsel, Assistant Prosecuting Attorney Alison E. McCarty, wept. According to defense counsel, McCarty "[cried] for 30 seconds to a minute" and had "tears running down her face." Defense counsel believed that "at least a couple of the jurors [were] watching her cry." After Michael Thorpe left the stand, the defense moved for a mistrial because of McCarty's behavior. The trial court overruled the motion.

**{¶ 40}** In his eighth proposition of law, defendant contends that McCarty's weeping in front of the jury required a mistrial. Defendant cites *State v. Morales* (1987), 32 Ohio St.3d 252, 513 N.E.2d 267, a case involving a spectator's emotional outburst. However, *Morales* lends no support to defendant's position. *Morales* holds that whether an emotional outburst improperly influences the jury against the accused is a factual question to be resolved by the trial court, whose determination will not be overturned absent clear, affirmative evidence of error. *Id.*, 32 Ohio St.3d at 255, 513 N.E.2d at 271, quoting *State v. Bradley* (1965), 3 Ohio St.2d 38, 32 O.O.2d 21, 209 N.E.2d 215, syllabus. See, also, *State v. Bailey* (1982), 132 Ariz. 472, 477, 647 P.2d 170, 175 (reviewing court deferred to trial court's finding that prosecutor's weeping did not affect jury).

**{¶ 41}** But defendant argues that no deference is owed here because the trial judge could not see the jury. During discussion of the mistrial motion, the judge did indeed state that the courtroom was set up in such a way that she could not "see the expressions of the jury." (We note, however, that the record does not support defendant's more extravagant claim that the jurors were sitting "in front of the judge with their backs to the Court.") But even though the judge could not see the jurors' expressions, she was still better positioned to perceive their reactions than any reviewing court could ever be. Consequently, deference remains appropriate.

{¶ 42} Other courts have not automatically reversed convictions solely because a prosecutor wept in the jury's presence. Where the weeping was not shown to have affected the jury, convictions have been allowed to stand. See *Bailey; Gibbins v. State* (1997), 229 Ga.App. 896, 901, 495 S.E.2d 46, 51. Cf. *People v. Dukes* (1957), 12 Ill.2d 334, 341-343, 146 N.E.2d 14, 17-18 (reversing conviction where prosecutor wept *and* engaged in other misconduct that deliberately exploited jury's emotions).

{¶ 43} We certainly cannot condone a prosecutor's weeping in open court. The prosecutor, as the representative of the state, ought to exercise self-control and has a professional obligation to refrain from creating prejudice against the defendant. However, as suggested by defense counsel's allegation that at least four of the spectators in the court room were crying, as well, "any capital trial generates strong emotions. * * * Realism compels us to recognize that criminal trials cannot be squeezed dry of all feeling." *State v. Keenan* (1993), 66 Ohio St.3d 402, 408-409, 613 N.E.2d 203, 208-209.

{¶ 44} In this case, we see no indication of a deliberate, sustained attempt to manipulate and inflame the jury's emotions, such as what occurred in *Keenan* and *Dukes*. Thus, the question here is simply what effect the prosecutor's tears had on the jury. Nothing in the record shows clearly and affirmatively that McCarty's tears had any effect. We therefore lack a basis to find that the trial court abused its discretion when it denied defendant's mistrial motion. Accordingly, defendant's eighth proposition is overruled.

## IV. "OTHER ACTS" EVIDENCE

{¶ 45} In his ninth proposition of law, defendant contends that the state violated Evid.R. 404(B) (governing "other acts" evidence) by introducing Heather Kawczk's testimony that defendant sometimes struck her during their relationship.

{¶ 46} Kawczk testified that defendant sometimes "smacked" her when he was angry. This happened "a couple times" before she moved in with him and

became "a little bit more frequent" after that. The prosecutor stated that he offered this testimony to show motive and to explain "the defendant's relationship with Heather, which we feel is the primary triggering factor in the [murders]." The state never argued that defendant's behavior showed his bad character or propensity for violence.

{¶ 47} Defendant nevertheless claims that the testimony was relevant only to show his bad character. We disagree. Defendant's beating Kawczk tends to show his jealousy and resulting rage toward her, emotions that gave defendant a strong motive to kill her mother and boyfriend. Moreover, the beatings explain why Kawczk left defendant and refused to go to his apartment, which in turn explains why Julie Schrey and Deborah Thorpe were there instead. Thus, the evidence was relevant for purposes other than showing bad character. Accordingly, defendant's ninth proposition is overruled.

## V. VICTIM IMPACT

{¶ 48} In his twelfth proposition of law, defendant contends that the state introduced impermissible victim-impact evidence. Defendant was convicted of a capital crime with respect to Deborah Thorpe's murder only. However, in the penalty phase, in addition to calling witnesses to testify about the impact of Deborah Thorpe's murder, the state called Julie Schrey's widower, Dennis Schrey, to tell how Julie Schrey's murder had affected him. Also, Michael Thorpe's brother, Robert Thorpe, told how Michael Thorpe's injuries had affected the Thorpe family.

{¶ 49} For the reasons that follow, we hold that the victim-impact testimony by Dennis Schrey, and the victim-impact testimony by Robert Thorpe concerning Michael's injuries, were improperly admitted. Nevertheless, admission of this evidence was harmless error.

*Historical Perspective*

12

**{¶ 50}** Historically, victims' participation in the American criminal justice system has been narrowly limited. Although the victim is the party who is harmed, the crime is considered as having been committed against the state, and the state is responsible for prosecuting the defendant on behalf of the people and ensuring that the sentence against the defendant is carried out. Some victims contend that the criminal process excludes them, even treats them as merely another piece of evidence, thereby victimizing them a second time.[2]

**{¶ 51}** Victims' dissatisfaction with the criminal justice system's focus on the defendant contributed to the growth of victims' rights organizations. In 1984, there were approximately 2,000 government and private victim assistance organizations. By 1991, there were over 7,000.[3] After restitution programs and victim-witness assistance programs were established, the victims' rights movement sought to allow victims to participate in the sentencing phase of capital trials via victim-impact evidence.[4]

---

2. See Note, The *Payne* of Allowing Victim Impact Statements at Capital Sentencing Hearings (1992), 45 Vand.L.Rev. 1621, 1624.

3. Bartolo, *Payne v. Tennessee*: The Future Role of Victim Statements of Opinion in Capital Sentencing Proceedings (1992), 77 Iowa L.Rev. 1217, 1217-1218.

4. See Note, The *Payne* of Allowing Victim Impact Statements at Capital Sentencing Hearings (1992), 45 Vand.L.Rev. 1621, 1624-1629.

*United States Supreme Court Jurisprudence*

**{¶ 52}** In *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720, the United States Supreme Court reconsidered its previous rejection of victim-impact evidence. A jury convicted the defendant of two counts of first-degree murder and one count of assault with intent to commit first-degree murder. The defendant was sentenced to death for each of the murders and to thirty years in prison for the assault. Payne's victims were twenty-eight-year-old Charisse Christopher, her two-year-old daughter, Lacie, and her three-year-old son, Nicholas, who survived the attack.

**{¶ 53}** During the sentencing phase, the defendant presented the testimony of four witnesses: his mother and father, a friend, and a clinical psychologist. The state presented the testimony of Charisse Christopher's mother. When asked how Nicholas had been affected by the murders of his mother and sister, she responded: " 'He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie.' " *Id.* at 814-815, 111 S.Ct. at 2603, 115 L.Ed.2d at 728. In addition, the prosecutor, in closing argument at the penalty stage, recited again the injuries to Nicholas, the noncapital victim. "But we do know that Nicholas was alive. And Nicholas was in the same room. Nicholas was still conscious. His eyes were open. He responded to the paramedics. He was able to follow their directions. He was able to hold his intestines in as he was carried to the ambulance." *Payne*, 501 U.S. at 815, 111 S.Ct. at 2603, 115 L.Ed.2d at 728-729. The prosecutor concluded, "There is obviously nothing you can do for Charisse and Lacie Jo. But there is something that you can do for Nicholas." *Id.* at 815, 111 S.Ct. at 2603, 115 L.Ed.2d at 729. The jury imposed the death penalty.

**{¶ 54}** The court stated that a misreading of its previous holdings had "unfairly weighted the scales in a capital trial; while virtually no limits are placed

on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering 'a quick glimpse of the life' which a defendant 'chose to extinguish' * * *, or demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide." (Citation omitted.) *Id.*, 501 U.S. at 822, 111 S.Ct. at 2607, 115 L.Ed.2d at 733.

**{¶ 55}** The court held that "for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase *evidence of the specific harm caused by the defendant*." (Emphasis added.) *Id.*, 501 U.S. at 825, 111 S.Ct. at 2608, 115 L.Ed.2d at 735. " 'It is an affront to the civilized members of the human race to say that at sentencing in a capital case, a parade of witnesses may praise the background, character and good deeds of Defendant * * * without limitation as to relevancy, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims.' " *Id.*, 501 U.S. at 826, 111 S.Ct. at 2609, 115 L.Ed.2d at 736, quoting the state Supreme Court decision, *State v. Payne* (Tenn.1990), 791 S.W.2d 10, 19.

**{¶ 56}** Accordingly, the court held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated." *Payne*, 501 U.S. at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736.

**{¶ 57}** Justice Souter's concurrence mirrored Justice O'Connor's concurring comments: "Murder has foreseeable consequences. When it happens, it is always to distinct individuals, and, after it happens, other victims are left behind. Every defendant knows, if endowed with the mental competence for

criminal responsibility, that the life he will take by his homicidal behavior is that of a unique person, like himself, and that the person to be killed probably has close associates, 'survivors,' who will suffer harms and deprivations from the victim's death. Just as defendants know that they are not faceless human ciphers, they know that their victims are not valueless fungibles; and just as defendants appreciate the web of relationships and dependencies in which they live, they know that their victims are not human islands, but individuals with parents or children, spouses or friends or dependents. Thus, when a defendant chooses to kill, or to raise the risk of a victim's death, this choice necessarily relates to a whole human being and threatens an association of others, who may be distinctly hurt." *Id.* at 838, 111 S.Ct. at 2615-2616, 115 L.Ed.2d at 744.

*Ohio's Victims' Rights Act*

{¶ 58} Since *Payne,* at least thirty-two of the thirty-eight states that impose the death penalty have incorporated victim-impact statements into their capital sentencing proceedings.[5] On November 8, 1994, Section 10a, Article I of the Ohio Constitution was adopted to grant crime victims the right to a meaningful role in the criminal justice process.[6] Proponents of this section "pointed out that while [Section] 10, Article I of the Ohio Constitution was adopted to protect the rights of persons accused of crime, there was no corresponding section in the Constitution to protect the rights of victims of crime, and adoption of this section was thus 'a

---

5. See Note, Thou Shalt Not Kill Any Nice People: The Problem of Victim Impact Statements in Capital Sentencing (1997), 35 Am.Crim.L.Rev. 93, 99–101.

6. Section 10a, Article I of the Ohio Constitution provides: "Victims of criminal offenses shall be accorded fairness, dignity, and respect in the criminal justice process, and, as the general assembly shall define and provide by law, shall be accorded rights to reasonable and appropriate notice, information, access, and protection and to a meaningful role in the criminal justice process. This section does not confer upon any person a right to appeal or modify any decision in a criminal proceeding, does not abridge any other right guaranteed by the Constitution of the United States or this constitution, and does not create any cause of action for compensation or damages against the state, any political subdivision of the state, any officer, employee, or agent of the state or of any political subdivision, or any officer of the court."

question of balance.' " 1994 Editor's Comment, Section 10a, Article I, Ohio Constitution, Baldwin's Ohio Revised Code.

{¶ 59} To that end, prior to the effective date of the constitutional amendment, the General Assembly enacted the Victims' Rights Act on May 26, 1994, which became effective on October 12, 1994. 145 Ohio Laws, Part II, 2085. The Act amended victims' rights law, repealed other sections of the Revised Code, and enacted R.C. Chapter 2930. R.C. Chapter 2930 includes provisions entitling victims to make a written or oral statement to the court regarding the impact of the crime on their lives, requiring the court to consider the victim-impact statement in determining the sentence to be imposed, and providing the victim the opportunity to make a statement to the court before sentencing. See former R.C. 2930.13, 2930.14, 2947.051, and 2929.19.

{¶ 60} In addition to enacting R.C. Chapter 2930, the General Assembly repealed former R.C. 2943.041 and 2945.07, which expressly excluded victim-impact evidence from capital cases. The newly enacted provisions in R.C. Chapter 2930, as well as related sections of the code, no longer contain this express exclusion. However, the new statutory scheme is silent as to how victim-impact evidence may be presented to *juries* in capital cases. Although the court has recognized situations where such evidence may be properly presented to a jury, the statutes only address the presentation of such evidence to the *courts*. Thus, the General Assembly has yet to expand victim-impact evidence in capital cases to the extent allowed in *Payne*.

*Ohio Jurisprudence*

{¶ 61} However, since the constitutional amendment and the Victims' Rights Act, this court has had an opportunity to address the issue of victim-impact evidence in capital cases a number of times. This court permitted a jury to review victim-impact evidence in *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878, 883, where the court found that "evidence which depicts *both* the

circumstances surrounding the commission of the murder and also the impact of the murder on the victim's family may be admissible during *both* the guilt and sentencing phases." (Emphasis *sic.*) *Id.* at 440, 650 N.E.2d at 882-883.

{¶ 62} Later, in *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, this court noted that R.C. 2929.03(D)(1) provides that "in making a determination whether a death sentence should be imposed, '[t]he court, and the trial jury if the offender was tried by a jury, *shall consider * * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing* or to any factors in mitigation of the imposition of the sentence of death, *shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing*, the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, and any other factors in mitigation of the imposition of the sentence of death, and shall hear the statement, if any, of the offender, *and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender.*' (Emphasis added.)" *Id.* at 352-353, 662 N.E.2d at 319.

{¶ 63} As recently as last year, this court held that "in attempting to *refute or rebut the mitigating evidence offered*, relevant victim-impact evidence is permissible other evidence pursuant to R.C. 2929.03(D)(2)." (Emphasis *sic.*) *State v. McNeill* (1998), 83 Ohio St.3d 438, 446, 700 N.E.2d 596, 606. In addition, victim-impact evidence may be admitted through a presentence investigation report should the defendant request one. See R.C. 2929.03(D)(1).

{¶ 64} Thus, this court has held that capital sentencing juries are permitted to review victim-impact evidence if the evidence is relevant to the circumstances of the murder, the existence of the statutory aggravating circumstances that permit the death penalty, and the nature and circumstances of the statutory aggravating circumstances, if the evidence is introduced to attempt to refute or rebut the

mitigating evidence offered, or if the defendant requests a presentence investigation report.

{¶ 65} In capital cases, since the victim is deceased, the "victim" would be the victim's representative who would be permitted to speak on behalf of the victim pursuant to R.C. 2930.02. It is important to note that the defendant does not challenge the portion of Robert Thorpe's testimony that relates to the impact from the death of his mother, Deborah Thorpe, the capital victim.

{¶ 66} However, the defendant challenges the testimony that related to the impact on the noncapital victims, Julie Schrey and Michael Thorpe. That testimony should not have been permitted under Ohio's statutory framework. A review of Ohio's statutory framework on victim-impact evidence indicates that testimony relating to *noncapital* victims is currently to be presented only to judges, who are charged with the responsibility of sentencing in noncapital cases.

{¶ 67} For example, former R.C. 2930.13 provides for the victim to make a written or oral statement to the *judge*. Further, former R.C. 2930.14 allows the victim to make a statement prior to sentencing. It provides: "(A) Before imposing sentence upon the defendant for the commission of a crime, the court shall permit the victim of the crime to make a statement concerning the effects of the crime upon the victim, the circumstances surrounding the crime, and the manner in which the crime was perpetrated. At the *judge's* option, the victim may present the statement in writing prior to the sentencing hearing, orally at the hearing, or both. (B) The *court* shall consider the victim's statement along with other factors that the *court* is required to consider in imposing sentence." (Emphasis added.) R.C. 2930.14(A) and (B).

{¶ 68} In this case, the victim-impact evidence at issue related to noncapital crimes for which the judge alone bore the responsibility for sentencing. Dennis Schrey (widower of Julie Schrey, the noncapital crime victim) testified about the impact of his wife's death. Further, Robert Thorpe (son of Deborah Thorpe, the

capital-crime victim, and brother of Michael Thorpe, the attempted-murder victim), in addition to testifying about his mother's death, testified about the effects of Michael Thorpe's injuries on the family.

{¶ 69} While Dennis Schrey (a representative of victim Julie Schrey) and Robert Thorpe (a relative of Michael Thorpe) were clearly representatives of victims, they were not testifying about the impact of the *capital* crime, *i.e.*, on behalf of the capital victim, Deborah Thorpe, pursuant to R.C. 2930.14. Because this evidence was unrelated to the *capital* murder for which the defendant was to be sentenced, it was improperly admitted. Such testimony was admissible only for the judge alone to hear, as it related to sentencing on the two noncapital crimes.

{¶ 70} However, while admission of this evidence violated Ohio's statutory scheme, it was not a constitutional violation. *Payne* clearly allows the presentation of victim-impact testimony to a capital jury if a "State chooses to permit" such testimony. *Payne*, 501 U.S. at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736. *Payne* clearly allows such testimony when the crimes are so interrelated that victims are affected by more than just the capital death. *Payne* does not limit the "evidence of the specific harm" caused by the defendant to the capital victim's family only, but allows the jury to assess the "defendant's moral culpability and blameworthiness" by victim-impact "evidence of a general type long considered by sentencing authorities." *Id.*, 501 U.S. at 825, 111 S.Ct. at 2608, 115 L.Ed.2d at 735. However, Ohio's statutory provisions as yet make no such specific provision for such noncapital victim-impact testimony to be presented to a jury in a capital case. Therefore, the admission of the evidence in question was, at most, a statutory violation.

{¶ 71} Further, there was more than ample evidence to support the jury's determination that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. As such, we find the error to be harmless. See *McNeill*,

83 Ohio St.3d at 447, 700 N.E.2d at 606, quoting *State v. Webb* (1994), 70 Ohio St.3d 325, 335, 638 N.E.2d 1023, 1032.

{¶ 72} Accordingly, defendant's twelfth proposition of law is overruled.

## VI. EXCLUSION OF MITIGATION

{¶ 73} In the penalty phase, the defense called as an expert witness Lawrence J. Whitney, an attorney experienced in capital cases. Whitney was called to testify about the total minimum time that defendant, if sentenced to life imprisonment, would have to serve before parole eligibility, including the time that he would serve on the firearm specifications attached to each of the three counts of the indictment.

{¶ 74} According to the defense proffer, Whitney would have testified that the law would require defendant to serve at least twenty-nine or thirty-nine full years' incarceration before becoming eligible for parole. This would consist of twenty or thirty full years on the aggravated murder, pursuant to R.C. 2929.04(A), plus three years' actual incarceration for each of the three firearm specifications, all of which would run consecutive to the life sentence and to each other (see former R.C. 2929.71[B]).

{¶ 75} Subsequently, the defense amended its proffer to reflect that the trial court might (as it ultimately did) merge the firearm specifications attached to the Day Street apartment shootings, requiring defendant to serve only twenty-six or thirty-six full years before parole eligibility.

{¶ 76} However, the prosecution objected to *any* testimony about how the firearm specifications would affect defendant's parole eligibility, arguing that the specifications were not a mitigating factor. The trial court sustained this objection. Accordingly, Whitney was permitted to explain the meaning of "full" years of incarceration but not to testify on the firearm specifications.

{¶ 77} In his fourteenth proposition of law, defendant contends that the exclusion of testimony regarding the firearm specifications' effect on the total

sentence denied him the right to present relevant mitigating evidence, thereby contravening the Eighth Amendment. See, *e.g., Eddings v. Oklahoma* (1982), 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1. Defendant also contends that the exclusion was fundamentally unfair, thus raising a due process question. See *Simmons v. South Carolina* (1994), 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133. We deal first with the Eighth Amendment claim.

{¶ 78} In Eighth Amendment jurisprudence, mitigating factors are facts about the defendant's character, background, or record, or the circumstances of the offense, that may call for a penalty less than death. See *Franklin v. Lynaugh* (1988), 487 U.S. 164, 174, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155, 166 (plurality opinion), and *id*. at 188, 108 S.Ct. at 2335, 101 L.Ed.2d at 175 (O'Connor, J., concurring).

{¶ 79} The length of incarceration to be served by the defendant before parole eligibility is not a fact about the defendant's character or background, or about the circumstances of the offense. See *O'Dell v. Netherland* (1997), 521 U.S. 151, 162-168, 117 S.Ct. 1969, 1976-1977, 138 L.Ed.2d 351, 362-364 (distinguishing between information about the defendant and information about parole); *Smith v. State* (Tex.Crim.App.1995), 898 S.W.2d 838, 853. Thus, it is not a mitigating factor for Eighth Amendment purposes.

{¶ 80} We turn, then, to the due process issue. *Simmons v. South Carolina* holds that in a capital case, "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Id.*, 512 U.S. at 156, 114 S.Ct. at 2190, 129 L.Ed.2d at 138 (plurality opinion); see, also, *id*., 512 U.S. at 178, 114 S.Ct. at 2201, 129 L.Ed.2d at 150-151 (O'Connor, J., concurring).

{¶ 81} Some courts have extended *Simmons* to require that the jury be given *complete* information on parole eligibility. See *Clark v. Tansy* (1994), 118 N.M.

22

486, 492, 882 P.2d 527, 533; *State v. Martini* (1993), 131 N.J. 176, 312-313, 619 A.2d 1208, 1280. Defendant asks us to do likewise.

**{¶ 82}** We cannot read *Simmons* so broadly. In *Simmons*, life without parole was the *sole* alternative to death—a point stressed by the concurring justices who cast the deciding votes in that case. See 512 U.S. at 176, 114 S.Ct. at 2200-2201, 129 L.Ed.2d at 150-151 (O'Connor, J., concurring). In the case at bar, life without parole was not an alternative *at all.* Thus, the jury was not given a "*false* choice between sentencing [defendant] to death and sentencing him to a limited period of incarceration." (Emphasis added.) *Simmons*, 512 U.S. at 161, 114 S.Ct. at 2193, 129 L.Ed.2d at 141. The choice before the jury was, in fact, between sentencing White to death and sentencing him to life with the possibility of parole. In these circumstances, *Simmons* does not apply. See *Muniz v. Johnson* (C.A.5, 1998), 132 F.3d 214, 224; *State v. Bush* (Tenn.1997), 942 S.W.2d 489, 503; *Smith v. State*, 898 S.W.2d at 850.

**{¶ 83}** Moreover, the prosecutor in *Simmons* "relie[d] on a prediction of future dangerousness in requesting the death penalty." 512 U.S. at 164, 114 S.Ct. at 2194, 129 L.Ed.2d at 143. In the case at bar, the state did not argue future dangerousness—a crucial distinction, since *Simmons* rests on the principle that a capital defendant may not be sentenced to death " 'on the basis of information which he had no opportunity to deny or explain.' " *Id.* at 164, 114 S.Ct. at 2194, 129 L.Ed.2d at 143, quoting *Gardner v. Florida* (1977), 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393, 404. What *Simmons* affords is a "narrow right of *rebuttal* * * * in a limited class of capital cases." (Emphasis added.) *O'Dell*, 521 U.S. at 167, 117 S.Ct. at 1978, 138 L.Ed.2d at 365. Here, defendant was not seeking to rebut an argument on future dangerousness. Again, *Simmons* does not apply.

**{¶ 84}** We conclude that the trial court neither violated the Eighth Amendment nor deprived defendant of due process by excluding information about

the effect of the firearm specification on his parole eligibility. Accordingly, defendant's fourteenth proposition is overruled.

## VII. SENTENCING OPINION

{¶ 85} R.C. 2929.03(F) requires the trial court's sentencing opinion to be filed with the clerk of this court within fifteen days after imposition of sentence. Because defendant was sentenced on October 31, 1996, the opinion should have been filed here by November 15. This was not done, however, until January 22, 1997, when the entire record (including the sentencing opinion) was filed with the clerk. In his seventh proposition of law, defendant contends that this invalidates his death sentence. But we do not see, and defendant does not explain, how the late filing could have prejudiced him. Hence, we find the error harmless and overrule defendant's seventh proposition.

{¶ 86} In his seventeenth proposition, defendant attacks the trial court's sentencing opinion. Defendant claims the trial court discounted his low intelligence as a mitigating factor because it did not meet the legal test for insanity. Cf. *Eddings v. Oklahoma*. However, nothing in either the sentencing opinion or the trial judge's remarks from the bench suggests that the trial court applied an insanity standard to the proffered mitigation.

{¶ 87} The sentencing opinion also noted that defendant's sister, raised in the same environment as defendant, was "a responsible adult" pursuing a college education, and the trial judge stated at the sentencing hearing that "[m]any members of our society have low intelligence and have been raised in circumstances similar to your own [and] they do not * * * deliberately kill." Defendant argues that these comparisons "denied [him] an individualized sentencing determination." However, "[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the [sentencer] to consider all relevant mitigating evidence." *Blystone v. Pennsylvania* (1990), 494 U.S. 299, 307, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255, 264. Both the jury and judge considered defendant's mitigating evidence.

{¶ 88} Accordingly, defendant's seventeenth proposition is overruled.

## VIII.  INEFFECTIVE ASSISTANCE

{¶ 89} In his tenth proposition of law, defendant claims ineffective assistance of trial counsel.  To prevail, he must show (1) that counsel performed so deficiently that they were not functioning as the "counsel" guaranteed by the Sixth Amendment and (2) that counsel's errors were prejudicial.  *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693.  Performance is "deficient" when it falls below an objective standard of reasonable representation.  *Id*. at 690-691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695-696.  "Prejudice" means a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different; "[a] reasonable probability is a probability sufficient to undermine [the court's] confidence in the outcome."  *Id*. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.  See, generally, *State v. Bradley* (1989), 42 Ohio St.3d 136, 142-143, 538 N.E.2d 373, 379-381, and paragraphs two and three of the syllabus.  (Contrary to the state's claim, the defendant need *not* show that, but for the error, the trial *would* have come out differently.  *Strickland*, 466 U.S. at 693-694, 104 S.Ct. at 2068, 80 L.Ed.2d at 697.)

{¶ 90} Defendant argues that counsel should have objected when the trial court excluded prospective juror Donald C. Burgess for cause due to his beliefs about capital punishment.  However, the trial court had a strong basis to excuse Burgess, who repeatedly said that he did not know whether he could vote to impose the death penalty if the law so required.  On these facts, and given the strong deference owed to the trial court's resolution of challenges for cause, see *State v. Wilson,* it was reasonable for counsel not to object.

{¶ 91} Defendant also complains that his counsel did not attempt to "educate or rehabilitate" Burgess on the death penalty in order to keep him on the panel.  But defendant's argument *assumes* that Burgess was a desirable juror for the defense.  The record does not show that, and we decline to speculate on the

matter. For all we know, counsel may have welcomed Burgess's excusal for some reason unrelated to his death-penalty views. Cf. *Wainwright v. Witt*, *supra*, 469 U.S. at 437-438, 105 S.Ct. at 859, 83 L.Ed.2d at 860 (Stevens, J., concurring). Trial counsel is in a better position than we are to decide whether a juror can or should be rehabilitated. *Bradley,* 42 Ohio St.3d at 143, 538 N.E.2d at 381.

{¶ 92} At defendant's arraignment on January 23, 1996, defendant's counsel entered on his behalf a plea of not guilty by reason of insanity and also requested an evaluation of defendant's competence to stand trial. Defendant was examined by psychologist Dr. Yossef Ben-Porath. After receiving the results of this evaluation, the defense withdrew the insanity plea. After defendant was convicted, the defense called Dr. James Eisenberg to testify in the penalty phase regarding defendant's mental condition. The state called Dr. Ben-Porath to rebut Dr. Eisenberg's testimony.

{¶ 93} Defendant contends that his counsel should have requested expert assistance pursuant to R.C. 2929.024 rather than a mental evaluation under R.C. 2945.37. Had counsel done so, defendant argues, "they could have retained control over the content and presentation of their penalty case." See *Glenn v. Tate* (C.A.6, 1995), 71 F.3d 1204.

{¶ 94} However, pursuant to former R.C. 2945.371(A) and 2945.39(A), defendant's counsel had no choice regarding a mental evaluation. Former R.C. 2945.371(A) provided: "If the issue of a defendant's competence to stand trial is raised under section 2945.37 of the Revised Code, the court may order one or more, but not more than three evaluations of the defendant's mental condition." (Emphasis added.) 138 Ohio Laws, Part II, 4209. Similarly, former R.C. 2945.39(A) provided: "If a defendant enters a plea of not guilty by reason of insanity, the court may order one or more, but not more than three, evaluations of the defendant's mental condition at the time of the commission of the offense." 143 Ohio Laws, Part III, 5352. Thus, once counsel had raised the issue of sanity and

competence, they could not have blocked the evaluations. (White makes no claim that counsel's decision to raise the sanity and competence issues *itself* constituted ineffective assistance.)

{¶ 95} Defendant also contends that defense counsel should have invoked former R.C. 2945.38(J) and former R.C. 2945.39(D), presumably to prevent Dr. Ben-Porath from testifying against him in the penalty case. Former R.C. 2945.38(J) provided: "No statement made by a defendant in an examination * * * relating to [his] competence to stand trial shall be used in evidence against [him] on the issue of guilt * * * ." 142 Ohio Laws, Part I, 760. Former R.C. 2945.39(D) provided: "No statement made by a defendant in an examination * * * relating to his mental condition at the time of the commission of an offense shall be used in evidence against him on the issue of guilt * * * ." 143 Ohio Laws, Part III, 5353. Defendant appears to contend that his counsel should have invoked these statutes to prevent Dr. Ben-Porath from testifying against him in the penalty phase.

{¶ 96} In fact, however, defendant's counsel did attempt to block Dr. Ben-Porath's testimony. Before the penalty phase, counsel filed a motion *in limine* asking that the state be precluded from using Dr. Ben-Porath's testimony or report "on rebuttal or for any other purpose" in the penalty phase, on the ground that the evaluations "were for the purposes of competency and sanity evaluation only" and "not * * * for the purpose of rebutting defense psychological testimony at the penalty phase." The trial court denied the motion on authority of *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895. Since defendant's counsel tried to have Dr. Ben-Porath's testimony excluded, there is no factual foundation for defendant's claim of attorney neglect.

{¶ 97} Defendant argues that his counsel were ineffective because certain discussions between the court and counsel, concerning "the order of proceedings" with regard to victim-impact testimony, are not in the record. However, defendant does not explain how this omission was prejudicial.

**{¶ 98}** Defendant claims that his trial counsel "failed to request the lesser instruction [*sic*] at both the trial and the penalty phases." This assertion is too vague to permit analysis.

**{¶ 99}** Defendant complains that trial counsel did not object to the instructions' "defective" definition of "reasonable doubt." But that definition is sanctioned by our precedents, on which counsel could reasonably rely. See *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604. Finally, defendant complains that his counsel "failed to request an instruction on victim impact." However, defendant does not say what instruction he thinks counsel should have requested. Thus, we are unable to find either defective performance or prejudice.

**{¶ 100}** None of defendant's claims establishes ineffective assistance. Accordingly, defendant's tenth proposition is overruled.

## IX. SETTLED ISSUES

{¶ 101} Defendant's thirteenth and fifteenth propositions of law raise issues pertaining to the jury instructions. Defendant neither objected to the instructions at issue nor submitted his own proposed instructions under Crim.R. 30(A). These issues are waived. Defendant's thirteenth and fifteenth propositions are therefore overruled.

{¶ 102} In his second, third, fourth, eleventh, and sixteenth propositions of law, defendant reargues settled issues. Defendant's second, fourth, and sixteenth propositions are foreclosed by, *e.g., State v. Jenkins* (1984), 15 Ohio St.3d 164, 167-174, 210-211, 15 OBR 311, 314-319, 350-352, 473 N.E.2d 264, 272-277, 304-305, and paragraphs one and eight of the syllabus; *State v. Buell* (1986), 22 Ohio St.3d 124, 137-138, 22 OBR 203, 214-215, 489 N.E.2d 795, 807-808; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; *State v. Esparza* (1988), 39 Ohio St.3d 8, 9-10, 529 N.E.2d 192, 194-195; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103-104, 656 N.E.2d 643, 671. Defendant's third proposition is foreclosed by *State v. Gumm* (1995), 73 Ohio St.3d 413, 417-418, 653 N.E.2d 253, 259-260; his eleventh by *Phillips,* 74 Ohio St.3d at 101, 653 N.E.2d at 669; and his thirteenth by *Nabozny* and *Van Gundy*. These propositions are summarily overruled. See, generally, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

## X. INDEPENDENT REVIEW

{¶ 103} Having overruled defendant's propositions of law, we must now independently determine whether the evidence supports the jury's finding of aggravating circumstances, whether those aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, and whether the death sentence in this case is proportionate to sentences in similar cases. R.C. 2929.05(A).

*Aggravating Circumstances*

{¶ 104} Defendant was convicted of two aggravating circumstances in connection with Deborah Thorpe's murder: a course of conduct involving two or more purposeful killings or attempts to kill (R.C. 2929.04[A][5]), and murder to escape detection, apprehension, trial, or punishment for another crime (R.C. 2929.04[A][3]). The evidence supports these aggravating circumstances.

{¶ 105} With respect to the course-of-conduct specification, defendant admitted the three shootings, and the evidence shows that all three were committed with the purpose to kill. The physical evidence did not support defendant's claim that Julie Schrey struggled with him over the gun. The chief deputy coroner who examined the bodies concluded that Schrey was shot from two to four feet away. The slug that killed Schrey entered through the back of her right wrist, and police found a broken lighter and a singed cigarette near her body, all of which suggests that she was lighting a cigarette when defendant shot her. Finally, the gun's 7.5-pound trigger pull makes it unlikely that it just "went off," as defendant claimed.

{¶ 106} Defendant admitted to Detective McCain that he killed Deborah Thorpe for a reason, and hence purposefully: he said he did it because "he didn't want [Deborah Thorpe] to have to live with * * * seeing her friend killed." (This may not have been defendant's real reason for killing Deborah Thorpe; after all, the jury found that defendant killed her to escape detection, apprehension, trial, or conviction for another offense. The point here, however, is simply that defendant admitted that his *purpose* was to kill Deborah Thorpe.)

{¶ 107} Other evidence confirms defendant's purpose to kill Deborah Thorpe. Defendant had to pump the shotgun to eject the spent cartridge and reload the chamber. Moreover, the physical evidence indicates that he fired at Deborah Thorpe twice. A slug went through the *front* window; from this one may infer that defendant fired that shot at Deborah Thorpe, who was running for the door, and had

just reached it when defendant shot her. (Schrey was shot at the rear of the apartment.)

{¶ 108} Defendant's attempt to kill Michael Thorpe was also purposeful. Defendant was angry and had a strong motive to kill Thorpe, his rival for Kawczk. He shot Thorpe in the head, a vital area. Eyewitnesses contradicted defendant's claim that Thorpe tried to grab him as defendant was leaving the restaurant.

{¶ 109} With respect to the second specification, defendant admitted that he shot Julie Schrey first, in Deborah Thorpe's presence. Thus, one may infer that he killed Deborah Thorpe to eliminate the sole witness to Schrey's murder. See *State v. Jester* (1987), 32 Ohio St.3d 147, 148-149, 512 N.E.2d 962, 965.

*Mitigating Factors*

{¶ 110} Defendant was twenty-two years old at the time of the offense. His youth is entitled to some weight under R.C. 2929.04(B)(4). *State v. Grant* (1993), 67 Ohio St.3d 465, 486, 620 N.E.2d 50, 71; but, cf., *State v. Ballew* (1996), 76 Ohio St.3d 244, 257, 667 N.E.2d 369, 382 (age of twenty-two entitled to little weight). Also, defendant plainly lacks a "significant history of prior criminal convictions and delinquency adjudications." R.C. 2929.04(B)(5). His record consists solely of a few minor violations. We assign this factor significant weight.

{¶ 111} Defendant was the youngest of his mother's six children by three different fathers. Defendant's father, Clifton White, Jr., lived with the family "on and off." When defendant was six or seven years old, Clifton White, Jr. was imprisoned for raping his daughter.

{¶ 112} Defendant's mother, Shirley White, was an alcoholic. Defendant's sister testified that Shirley White was a "mean" drunk who would hit her children "maybe about once or twice [a] week" with a switch, belt, or electrical cord. However, defendant's sister was unclear as to how often Shirley White hit defendant. "About three times. * * * I don't know. He probably got more whoppings than I did."

{¶ 113} On the other hand, Shirley White testified that her temper was not "that bad" when she drank, and that she "whopped" her children "[n]ot that much, but whenever they did something bad." She also denied striking them with a cord, although she admitted using other objects to administer corporal punishment.

{¶ 114} The family moved frequently, living in five to ten different homes during defendant's childhood. Defendant attended eight different schools during the first six years of his education. Shirley White's children were taken from her custody at least once due to neglect and placed in a foster home.

{¶ 115} Defense psychologist, Dr. James Eisenberg, testified that defendant is "mildly mentally retarded," with an IQ of 63, in the lowest one percent of the population. Dr. Eisenberg administered part of the Minnesota Multiphasic Personality Inventory II ("MMPI II") to defendant, but could not get a valid result. Dr. Eisenberg believed that defendant did not understand the questions, which supported Dr. Eisenberg's diagnosis of retardation. Dr. Eisenberg also gave defendant the verbal portion of the Wechsler Adult Intelligence Scale Revised ("WAIS-R") and felt the result was valid; that result also indicated retardation.

{¶ 116} Dr. Eisenberg also concluded that defendant suffers from mild depression, a mental disorder characterized by loss of self-esteem, feelings of hopelessness, worthlessness, helplessness, which he blamed on defendant's dysfunctional family. Dr. Eisenberg cited two alleged suicide attempts by defendant. In 1992, defendant took an overdose of seventy vitamin pills, and about four days before the murders, he overdosed on Nytol. Finally, defendant had purchased a shotgun and talked to Heather Kawczk about killing himself with it.

{¶ 117} Rebuttal witness Dr. Yossef Ben-Porath, a consultant psychologist with the Psycho-Diagnostic Clinic ("PDC"), had evaluated defendant before trial for competency and sanity. Dr. Ben-Porath concluded that defendant had an antisocial personality disorder.

{¶ 118} Dr. Ben-Porath disagreed with Dr. Eisenberg's diagnosis of retardation. Defendant took intelligence tests at the PDC, but the results were invalid because defendant was uncooperative. According to Dr. Ben-Porath, defendant's test results and other information elicited from him indicated that he was malingering.

{¶ 119} Dr. Ben-Porath believed that defendant also malingered on the MMPI II administered by Dr. Eisenberg, because defendant's responses on the MMPI's validity scales were inconsistent with the random responses that would be expected of a person who could not understand the questions. (Dr. Ben-Porath was an expert on the MMPI II, having participated in its development and having trained psychologists in its use.) Furthermore, Dr. Ben-Porath testified, the verbal portion of the WAIS-R (the sole portion of that test given by Dr. Eisenberg) would tend to understate defendant's intelligence.

{¶ 120} Under the circumstances, we cannot find that defendant proved mental retardation by a preponderance of the evidence. In contrast, defendant's mild depression was undisputed, but it is unclear what role (if any) it played in these crimes. This is, at best, a weak mitigating factor.

{¶ 121} Defendant's family background is entitled to some mitigating weight. With a father in prison, an alcoholic and neglectful mother, and frequent changes of school and residence, defendant surely lacked the stability and moral instruction that most people have. Yet even backgrounds far worse than defendant's are seldom accorded major weight. Cf. *State v. Campbell* (1994), 69 Ohio St.3d 38, 54-55, 630 N.E.2d 339, 353-354; *State v. Murphy* (1992), 65 Ohio St.3d 554, 585, 605 N.E.2d 884, 908; *State v. Cooey*, 46 Ohio St.3d at 41, 544 N.E.2d at 919; *State v. Holloway* (1988), 38 Ohio St.3d 239, 245-246, 527 N.E.2d 831, 838-839.

{¶ 122} In his unsworn statement, defendant expressed remorse for his crimes: "I'm sorry for everything that happened * * * [.] I know everybody [is]

hurt over it.  I can't really explain it * * * ."  More important, he showed his remorse on the very day he committed the crimes, by summoning help for his victims and by turning himself in and confessing.  This factor is entitled to significant weight.  See *State v. Hicks* (1989), 43 Ohio St.3d 72, 80, 538 N.E.2d 1030, 1039.  However, its weight is limited here by defendant's lack of complete honesty.  Cf. *State v. Wiles* (1991), 59 Ohio St.3d 71, 93-94, 571 N.E.2d 97, 123.  In his unsworn statement and his confessions, defendant insisted that he meant to harm no one but himself, a claim we cannot accept.  Moreover, his version of the crime was inconsistent with the evidence.

{¶ 123} Defendant's sister and cousin testified that defendant had a close relationship with his daughter, Raven, one of the three children he fathered by three different mothers.  Defendant took care of Raven on weekends and when he did not have to work, "and she was happy with him. * * * [S]he never wanted to leave; and when he dropped her off, she cried * * * to be with her dad * * * ."  Defendant's relationship with his daughter is entitled to some weight.  See, *e.g.*, *State v. Webb* (1994), 70 Ohio St.3d 325, 342-343, 638 N.E.2d 1023, 1037-1038.

{¶ 124} There was some evidence that defendant took several Nytol tablets on the morning of the murders.  However, there was no testimony as to how the Nytol affected defendant.  Even if there had been some effect, voluntary intoxication is not a strong mitigating factor.  See, *e.g.*, *State v. Otte* (1996), 74 Ohio St.3d 555, 568, 660 N.E.2d 711, 723.

{¶ 125} Although a number of mitigating factors exist here, the aggravating circumstances of multiple murder and murder to escape accountability for another crime outweigh these mitigating factors beyond a reasonable doubt.

*Proportionality*

{¶ 126} We have frequently affirmed death sentences in cases where multiple murder was the only aggravating circumstance, including cases where "the defendant was * * * under significant emotional stress."  *State v. Williams* (1997),

79 Ohio St.3d 1, 20, 679 N.E.2d 646, 662-663. See, *e.g.*, *State v. Sowell* (1988), 39 Ohio St.3d 322, 336-337, 530 N.E.2d 1294, 1309-1310; *State v. Combs* (1991), 62 Ohio St.3d 278, 294, 581 N.E.2d 1071, 1084; *State v. Awkal* (1996), 76 Ohio St.3d 324, 338-339, 667 N.E.2d 960, 972-973.

{¶ 127} On the other hand, we reversed a death sentence on independent review in *State v. Lawrence* (1989), 44 Ohio St.3d 24, 541 N.E.2d 451, where the mitigating factors included depression, lack of significant criminal history, and the defendant's care for his family. However, Lawrence's mental problems, unlike defendant's, established a mitigating factor under R.C. 2929.04(B)(3) (diminished capacity). *Id.,* 44 Ohio St.3d at 32, 541 N.E.2d at 460. Lawrence could also point to military service and provocation as strong mitigating factors. Moreover, Lawrence's depression was severe; defendant's, according to defense witness Dr. Eisenberg, was mild. Thus, we find that the death sentence for defendant is not disproportionate.

{¶ 128} The judgment of the court of common pleas is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER and COOK, JJ., concur.

F.E. SWEENEY, J., concurs in judgment only.

———————————