After a jury trial, a mother was convicted of disorderly conduct and resisting arrest, and her daughter was convicted of assault. Both appeal, presenting numerous assignments of error. We hold that the trial court committed no error and affirm the convictions.
 I. The Fight
Appellant Wanda Adams and her daughter, appellant Michelle Adams, were involved in a fracas with Teri Abney, a teen-ager who lived within two blocks of Wanda's home. (We refer to Wanda and Michelle Adams by their first names for the sake of clarity, because they share the same last name.)
According to the state's evidence, Abney and her friends engaged in a verbal confrontation with Wanda's son, Tim Baggett. Soon afterwards, they walked to a relative's home near Wanda's house. Wanda, Michelle, Baggett, and Takeisha Adams, Michelle's eight-year-old daughter, along with some other people, confronted Abney and her friends about calling Wanda a racist name. Michelle started a physical fight with Abney by "getting in her face" and pulling her hair. Michelle bit Abney's neck and tried to choke her. Wanda hit Abney and ripped her shirt. Takeisha hit Abney on her back and pulled her hair. Abney fell to her knees, gasping for breath due to her asthma. The fight ended when Wanda and another person separated Abney and Michelle. Abney sustained a bite on her neck, scratches on her face, and bruises on her back. An officer took photographs of Abney's injuries.
According to Takeisha, Abney provoked a face-to-face confrontation with Wanda, pushed Wanda, and hit her on the arm. Abney then pushed Takeisha to the ground. At that point, Michelle arrived and asked Abney why she was harassing Wanda. Abney responded by calling Michelle a "nigger black bitch."
Wanda testified that she saw Abney and her friends coming down the street screaming, "Mother-fuckin' nigger." As a result of what her son had told her and the information provided by a neighbor, Barbara Cole, she became afraid and confronted the group. (Cole testified that she had observed the altercation and had seen Abney and her friends walk in the direction earlier taken by Baggett. She described to Wanda what she had seen.) Wanda told the group of teen-agers that they were not to hurt her son. Abney responded with more racist comments. When Takeisha appeared, Abney pushed her to the ground. She pointed her finger in Wanda's face and called her a name. She threw up her hands and hit Wanda on the arm. Wanda denied hitting Abney.
Michelle arrived, pushed Wanda to the side, and started arguing with Abney. Abney threw a roundhouse punch at Michelle and a fight broke out. Wanda tried to separate Michelle and Abney by pushing Abney back by her head and pulling Abney's shirt, ripping it.
Michelle testified that when she arrived from the grocery store, she saw a group of people surrounding Wanda. She saw Abney clutching Wanda's shirt and screaming in Wanda's face. She stepped between the two women. She asked Abney why she was accosting Wanda, and Abney replied, "Because your mother standing up here talkin' fuckin' shit to me." She then said to Michelle, "If you don't back the fuck up, I will knock your ass out."
Abney hit Michelle on the right side of her face with her fist. According to Michelle, Michelle had a bruise and scratches on her face. Abney and Michelle began to fight. Wanda tried to intervene, but Abney continued the fight and called Michelle a "black bitch" and a "black fuckin' nigger."
Michelle testified that she did not touch Abney until Abney swung at her with a closed fist. Michelle denied biting Abney. She testified that Wanda pulled her away from Abney, and that when Wanda separated the two women, Wanda ripped Abney's shirt. When the police arrived, Abney had dropped to the ground.
After Michelle had been arrested and taken to the police station, she was shown photographs of Abney's injuries. According to Michelle, she had requested that the police officers take photographs of her own injuries, but they had refused to do so. The police report failed to indicate any injuries to Michelle. One of the Cincinnati police officers testified that she had seen no bruises, swelling, or scratches on Michelle's right cheek.
 II. Wanda's Arrest A. The State's Evidence
Someone called the Cincinnati police about the fight. Several Cincinnati police officers responded to the broadcast of an assault in progress. After speaking with Abney, Cincinnati Police Officer Ronald Sanden broadcast an order for Wanda and Michelle to be handcuffed. The responding officers believed that this order meant that the two women were to be placed under arrest. According to the various officers' testimony, Wanda was told that she was under arrest, and she was ordered to put her hands behind her back to be handcuffed. Wanda understood the request, but jerked her arm away from the arresting female officer, Amy Moore. At that point, Takeisha, Tim Baggett, and Catrice Baggett attacked Officer Moore. She sprayed Mace to ward off her attackers. The spray affected not only the attackers, but also Wanda and other nearby police officers.
Meanwhile Cincinnati Police Officer Jay Johnstone tried to arrest Wanda. He tried to place her hands behind her back, but Wanda resisted. Officer Johnstone continued to struggle with Wanda, again trying to get her hands behind her back. They both fell. Wanda landed on her stomach, with her arms underneath her. Officer Johnstone landed on Wanda's back.
While on the ground, Officer Johnstone continued his attempt to handcuff Wanda, and he told her to place her arms behind her back. Wanda, according to the officer, continued to squirm, moved back and forth, and kept her body weight on her hand. Wanda eventually had one hand cuffed, but the other was not shackled until Officer Sanden sprayed her with more Mace. Officer Sanden testified that he used the Mace because Wanda had continued to struggle. Wanda finally told the officers that that she had asthma and that she could not breathe. Medical help was requested, and Wanda was taken to the hospital.
 B. Wanda's Evidence
According to Wanda, she did not struggle with the officers. When she questioned the reason for her arrest, an officer said, "We're taking you down," and turned her to grab her right arm. At that point, Takeisha reached for Wanda's right arm because she feared for Wanda's safety. During the handcuffing, Officer Moore bumped against Wanda, and Wanda slipped and fell to the ground. She landed on her face, and Officer Johnstone landed on her back. This prevented her from removing her arm from beneath her. When Wanda tried to tell the officer that she could not breathe, he told her "to keep [her] fuckin' ass still." Wanda testified that she was wriggling around because she was trying to tell the officer that she could not breathe and to raise her head.
Officer Johnstone finally pulled her arm from beneath her and handcuffed her. According to Wanda, she believed that she had done what the officers had asked her to do. She was taken to the hospital because of the effect of the Mace on her asthma.
 III. The Convictions and the Appeals
Wanda was charged with assault and resisting arrest. A jury found her guilty of resisting arrest and the lesser-included offense of disorderly conduct. She appeals her conviction, raising eight assignments of error. In her first and third assignments, she challenges the sufficiency of the evidence supporting her conviction. In her second assignment, she challenges the weight of the evidence. In her fourth assignment, Wanda asserts a Batson challenge. Wanda's fifth assignment claims that herSixth Amendment right to confrontation was violated by the trial court's limitation on her cross-examination. Wanda's sixth assignment alleges prosecutorial misconduct in closing argument. In her seventh assignment, Wanda asserts that she was denied effective assistance of counsel. In her last assignment, Wanda claims that her sentence was excessive and based on improper factors, including an ex parte communication between the prosecutor and the trial court.
Michelle was charged with assault and a jury found her guilty. She appeals her conviction, raising five assignments. Her second, third, fourth, and fifth assignments are substantially mirror images of Wanda's fourth, sixth, seventh, and eighth assignments. Michelle's first assignment, however, raises a different claim. She claims that the trial court erred by allowing a police officer to sit at the prosecution's table in violation of Evid.R. 615.
Although these appeals were separately filed, we have consolidated them for the sake of efficiency. We first address those assignments that do not overlap. Next, we address the common assignments.
 IV. Wanda's Individual Assignments A. Sufficiency and Weight of the Evidence
We address Wanda's first three assignments together, recognizing that different standards of review apply. In reviewing Wanda's sufficiency-of-the-evidence challenge, we must examine the evidence in a light most favorable to the state and determine whether it could have convinced any rational trier of fact that Wanda was guilty beyond a reasonable doubt of disorderly conduct and resisting arrest.[1] Our review of the challenge to the denial of Wanda's Crim.R. 29 motion for acquittal requires us to determine whether the evidence "[wa]s such that reasonable minds [could have] reach[ed] different conclusions" as to whether the state had proved each material element of the offenses beyond a reasonable doubt.[2] In contrast, when reviewing the weight-of-the-evidence challenge, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice.[3]
The conviction for resisting arrest required the state to prove beyond a reasonable doubt that Wanda had recklessly or by force interfered with the lawful arrest of herself.[4] The complaint charged Wanda with recklessly resisting arrest. One acts recklessly when he or she "with heedless indifference to the consequences, * * * perversely disregards a known risk that his [or her] conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he [or she] perversely disregards a known risk that such circumstances are likely to exist."[5]
Wanda claims that the state failed to prove that she acted recklessly, relying on her testimony concerning the events and Officer Johnstone's testimony that people who were sprayed with Mace frequently shook, screamed, and threw their arms around. The state's evidence was sufficient to establish that Wanda acted with heedless indifference to the consequences of her actions and perversely disregarded a known risk to herself and the officers. Similarly, we find no error in the trial court's denial of Wanda's Crim.R. 29 motion. We also conclude that, although there were conflicts in the evidence, the jury did not lose its way in resolving the conflicts.
To sustain the conviction for disorderly conduct, the state had to prove beyond a reasonable doubt that Wanda had recklessly caused inconvenience, annoyance, or alarm to another by (1) engaging in fighting, in threatening harm, or in violent or turbulent behavior; (2) making unreasonable noise or an offensively coarse utterance, gesture, or display, or communicating unwarranted and grossly abusive language to any person; (3) insulting, taunting, or challenging another under circumstances likely to provoke a violent response; (4) hindering or preventing movement on a public street; or (5) creating a physically offensive condition by an act that served no legal purpose.[6] Once again, with the evidence reviewed in a light most favorable to the state, Wanda grabbed Abney's hair, hit Abney in the head several times and ripped her shirt. Finally, one of Abney's friends pulled Wanda away. The evidence was sufficient for the court to deny Wanda's Crim.R. 29 motion and to sustain her conviction for disorderly conduct. Although Wanda contends that her involvement in the altercation was merely to break up the fight, we cannot conclude that the jury lost its way in finding more credible the testimony of the witnesses who testified otherwise. Thus, we conclude that Wanda's conviction for disorderly conduct was not against the weight of the evidence. We overrule Wanda's first three assignments.
 B. Right to Confrontation
In her fifth assignment, Wanda alleges that the trial court violated her Sixth Amendment right to confrontation by limiting her cross-examination of Officer Sanden regarding his personal knowledge of problems with teen-agers and whether he had personal knowledge of racial tension in the area where the incident occurred. We find no merit in this claim.
We have explained that while the Sixth Amendment to the United States Constitution provides a right to confrontation, that right is not unlimited.[7] The trial court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."[8]
Thus, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."[9]
We conclude that the trial court did not err in limiting Officer Sanden's cross-examination by sustaining the state's objections to marginally relevant issues-problems generally with teen-agers and general racial tension. While such questions concerning "problems" with Abney, if such evidence were deemed admissible by the trial court, or prior racial tension between the parties involved would have been relevant, we cannot conclude that disallowing more general questions prevented effective cross-examination. This conclusion is supported by our review of the entire record. Thus, we overrule Wanda's fifth assignment.
 V. Michelle's Individual Assignment Evid.R. 615 Michelle argues in her first assignment that the trial court erred by allowing Officer Amy Moore to remain in the courtroom throughout the trial, because the officer did not qualify under any of the Evid.R. 615 exceptions. Specifically, Michelle argues that Officer Moore was not essential to the presentation of the state's case, and that there was no evidence to show that, as a city police officer, Officer Moore was an officer or employee of the state.
Evid.R. 615 requires the court to order the separation of witnesses upon a motion to do so. Such an order cannot exclude from the courtroom "(1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause." This court has held that the trial court must grant a prosecuting attorney's request to have a designated representative of the state be present in the courtroom during trial.[10] We have explained, "In a criminal prosecution, a representative of the law enforcement agency handling the prosecution-even if the representative is a witness-may assist the prosecutor during trial and may remain in the courtroom although a separation of witnesses has been ordered."[11] Officer Moore arrived at the scene of the altercation between Michelle and Abney in response to the broadcast of an assault. She attempted to arrest Wanda. Clearly, Officer Moore was a member of the law enforcement agency involved in the prosecution of Michelle and, thus, was properly excluded from the order of separation. The fact that she was a Cincinnati police officer was sufficient to qualify her as an officer or employee of the state.[12]
Because Officer Moore was a designated representative, there is no need to determine whether she was essential to the state's presentation of its case. Thus, we overrule Michelle's first assignment.
 VI. The Batson Challenge In Wanda's fourth assignment and Michelle's second assignment, they contend that the trial court violated their due-process and equal-protection rights by allowing the state to exclude a prospective juror on the basis of race. The record demonstrates that Wanda and Michelle are black women. Assumedly the challenged prospective juror was as well. The state exercised a peremptory challenge to excuse a prospective juror because it believed that the woman's objectivity would be tainted because she had a child who was close in age to Takeisha and because she worked with emotionally disturbed children. Wanda and Michelle argue that because the record failed to support the reasons given for the challenge, the exclusion violated Batson v. Kentucky.[13]
To evaluate a claim of racial discrimination in the exercise of a peremptory challenge, a three-part test is used.[14] The defendant must first make a prima facie showing that the challenge has excluded a juror because of his or her race. (Because the trial court and the prosecutor proceeded as if Wanda and Michelle had established a prima facie case of discriminatory intent, whether they established a prima facie case is moot.[15]) The state then has the burden of production "to come forward with a race-neutral explanation."[16] At this step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."[17] The next step requires the court to "determine whether, under all the circumstances, the defendant ha[s] proven purposeful racial discrimination."[18]
To reverse a trial court's determination that there was no discriminatory intent, we must conclude that the determination was clearly erroneous.[19] A clearly erroneous determination is one where the reviewing court "is left with a definite and firm conviction that the trial court made a mistake * * *."[20]
Upon the exercise of the peremptory challenge in this case, defense counsel asked that the prosecution state its racially neutral reason for the challenge. The prosecution provided two reasons that did not involve race. Wanda argues that because the prosecution did not ask the challenged juror any questions, and because the record does not support the stated reasons, we must hold the trial court's determination to be clearly erroneous.
The transcript of the voir dire demonstrates that the jurors completed questionnaires and that counsel reviewed the answers. Defense counsel asked the potential jurors whether any had eight-year-old grandchildren, and each responded nonverbally. She then asked whether the twenty-six potential jurors would expect a grandchild to come to their defense. Defense counsel also noted on the record that several jurors had indicated on the questionnaires that they had children, and she asked whether they would expect an eight- or nine-year-old child to come to their defense if they were attacked. When the prosecution exercised the peremptory challenge, defense counsel did not question the truth of the fact that the juror did have an eight-year-old child or that she worked with children.
The record sufficiently supports the factual basis for the prosecution's legitimate concern for whether a potential juror who had a child the age of Takeisha, and who worked with children, could be objective. Thus, we cannot say that the trial court's decision to overrule the Batson challenge was clearly erroneous. We overrule Wanda's fourth assignment and Michelle's second assignment.
 VII. Alleged Prosecutorial Misconduct
In Wanda's sixth assignment and Michelle's third assignment, they argue that the prosecutor engaged in misconduct and that the misconduct prejudiced their rights to a fair trial. Specifically, they point to the prosecutor's closing argument. As we have previously explained, "The test for whether prosecutorial misconduct mandates reversal is whether remarks were improper, and, if so, whether they prejudicially affected the substantive rights of the accused."[21] "The prosecution is entitled to wide latitude in closing argument, but prosecutors may not express their personal beliefs regarding guilt and credibility, and may not allude to matters outside the record."[22] Further, a prosecutor's comments must be examined in the context of the entire argument.[23] Where no objection is made at trial to an alleged error, we cannot reverse absent plain error.[24] Plain error exists "only in those rare circumstances where the outcome of the trial would clearly have been otherwise without the error."[25]
Wanda and Michelle claim that the prosecutor's statement, "But that's what they want you — or are trying to lead you to believe that happened," in reference to the defense theory of self-defense constituted an accusation that the defense was attempting to deceive the jury. While it was inartfully phrased, we conclude that this comment addressed the quality and weight of the evidence supporting the women's defense. Thus, we conclude that the comment was not improper.
The prosecutor also commented on five people referred to throughout the trial and questioned why they were not called to testify. The prosecutor argued, "If I was [sic] being charged with a crime, I would subpoena everybody that I could find to come so that the truth can come out. I would subpoena everybody, and if they didn't come, I would send the sheriff out to bring their butts to court * * *. When your own family members won't come to court to testify on your behalf, it makes you kind of wonder." No objections were raised to these comments. Wanda claims that the comments impermissibly shifted the burden of proof to her.
The argument has no merit. As the Ohio Supreme Court has explained, where "the record reveals that the state merely pointed out the failure, on the part of defense counsel, to subpoena witnesses to prove its theory of the case[,]" there is no misconduct based on shifting of the burden.[26]
Included in her list of five persons who had not been called to testify was a Scott West, a neighbor of Wanda's who had been subpoenaed. Wanda and Michelle claim that the prosecutor's comment contravened Crim.R. 16(C)(3). Crim.R. 16(C)(3) states that "[t]he fact that a witness' name is on a list furnished under subsection (C)(1)(c), and that the witness is not called shall not be commented upon at trial." The Ohio Supreme Court, in State v. Hannah, has interpreted this rule to mean that no comment may be made as to a person's absence once his or her name has been placed on a witness list.[27] This interpretation provides an absolute bar to comment on such a witness's absence.
Three of the justices dissented from the majority opinion in State v.Hannah. In the dissent, Judge McCormac of the Tenth Appellate District, sitting by assignment, stated, "Crim.R. 16(C)(3) is designed to prevent any comment on the failure of a party to call a witness listed in response to discovery by noting that the party had listed the witness but failed to produce the witness. [It] was not designed to preclude valid comment upon the absence of a witness that would apply irrespective of the name being included in response to discovery."[28] Some Ohio appellate courts have adopted the dissent's interpretation of the rule-that the state cannot comment on the absence of a witness inconjunction with the fact that the witness was named on a witness list-noting that State v. Hannah contains no syllabus law.[29]
Under the facts of this case, however, we need not decide which is the better interpretation. Neither woman provided the state a witness list containing West's name; thus, Crim.R. 16(C)(3) did not apply.[30]
Therefore, there was no misconduct in referring to West's absence at trial. "It is the presumption in fact as well as law that, if a witness known to be present at the time a vital act takes place fails to be called and his absence is not accounted for by the party in whose favor he would naturally be expected to testify, it is not improper for counsel upon the other side to make comment."[31] Thus, we overrule Wanda's sixth assignment and Michelle's third assignment.
 VIII. Alleged Ineffective Assistance of Counsel
Wanda argues that she was deprived of effective assistance of counsel due to the failure of counsel to object to the allegedly improper comments by the prosecutor in her closing argument. Michelle argues that she was deprived of effective assistance of counsel due to the fact that both she and Wanda were represented by the same trial counsel, the failure of counsel to make a Crim.R. 29 motion at the close of the state's case, and the failure of counsel to object to the allegedly improper comments by the prosecutor in her closing argument.
In reviewing an ineffective-assistance-of-counsel claim, we must determine whether counsel's performance was deficient and whether the deficiency prejudiced the defense.[32] Because we have determined that the comments in closing argument were not improper, counsel's failure to object did not constitute performance that fell below an objective standard of reasonableness.
Because Michelle made no objection to joint representation below, to prevail on this aspect of her ineffective-assistance claim, she must now demonstrate that an actual conflict of interest adversely affected her counsel's performance.[33] We cannot "presume that the possibility for conflict resulted in ineffective assistance of counsel. The mere possibility of a conflict of interest is insufficient to impugn a criminal conviction. Further, a presumption of ineffective assistance of counsel in every instance of multiple representation would preclude multiple representation even in cases where a common defense gives strength against a common attack."[34] A "conflict of interest" occurs in a situation where "regard for one duty tends to lead to disregard of another."[35]
An actual conflict of interest exists if "during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action."[36] To prove an actual conflict of interest, there must be a showing that "some plausible alternative defense strategy or tactic might have been pursued" and that "the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."[37]
Michelle argues that because some witnesses seemed confused about which defendant did what to Abney, there was an actual conflict of interest. We disagree. Placing the blame on Wanda for biting Abney's neck or choking her was not a viable defense. Evidence of Wanda having bitten Abney's neck would not have negated Michelle's involvement in the fight. The state charged both women with the assault on Abney. The state's witnesses identified both Wanda and Michelle as Abney's attackers. If counsel had emphasized Wanda's involvement in the fight, counsel would have conceded that the state's theory was, in part, correct and would have bolstered the credibility of the state's witnesses. In other words, counsel would have risked substantiating Abney's testimony that Wanda had attacked her first without any reciprocal benefit to Michelle's claim of self-defense. By attacking the state's evidence against both women and claiming that Michelle and Wanda were defending themselves from an attack by a racist teen-ager, counsel appropriately attempted to undermine the state's evidence.
The Ohio Supreme Court has explained, "There is no conflict where the two defenses did not result in one assigning blame and where both defendants had a common interest in attacking the credibility of the prosecution witness."[38] That is the situation in this case. Michelle has failed to demonstrate that the joint representation denied her effective assistance of counsel.
Last, we conclude that counsel's failure to move for acquittal under Crim.R. 29 was not ineffective assistance, where the evidence in the state's case demonstrated that reasonable minds could have reached different conclusions as to whether the elements of assault had been proved beyond a reasonable doubt, and that such a motion would have been properly overruled.
Thus, we overrule Michelle's fourth and Wanda's seventh assignment.
 IX. Sentencing
In her eighth assignment, Wanda claims that the trial court erred by failing to consider certain mitigating factors and by considering an exparte statement by the prosecutor that two or three jurors had told her that they believed that Wanda, Michelle, and Takeisha had lied. Michelle, more generally, asserts that the ex parte conversation was prejudicial because it went directly to the merits of the case.
Wanda claims that the trial court erred by violating Evid.R. 606(B), which states that "[u]pon an inquiry into the validity of a verdict or indictment" a juror cannot testify as to what occurred during deliberations or to the effect of anything on his or any other juror's minds or emotions that influenced him concerning the verdict or the indictment. Evid.R. 606(B) was inapplicable to the facts of this case. This was not a situation concerning the validity of the jury's verdict. Further, except for capital cases, the Ohio Rules of Evidence do not apply to sentencing hearings.[39]
While an ex parte communication like the one in this case technically violates no rules, we disapprove of the state having conversations with the trial court concerning sentencing matters outside the presence of the defendant. In this case, the fact that some jurors had told the prosecutor that they did not believe the defense witnesses was no surprise and created no prejudice. Obviously, if they had believed the defense, there would have been an acquittal.
The fact that the trial court considered the veracity of the defendants was allowed under R.C. 2929.22, in that the factors provided for consideration "d[id] not control the court's discretion."[40] The record reflects that the trial court considered other factors in making its determination.
 X. Conclusion
Therefore, we affirm the trial court's judgments of conviction.
 _________________ Painter, J.
 Hildebrandt, P.J., and Winkler, J., concur.
[1] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[2] See State v. Bridgeman (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus.
[3] See State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717,720.
[4] See R.C. 2921.33.
[5] See R.C. 2901.22(C).
[6] See R.C. 2917.11.
[7] See State v. Melton (Mar. 9, 2001), Hamilton App. No. C-000156, unreported, citing Delaware v. Van Arsdall (1986), 475 U.S. 673, 679,106 S.Ct. 1431, 1435.
[8] See id., quoting Delaware v. Van Arsdall at 679,106 S.Ct. at 1435.
[9] See Delaware v. Fensterer (1985), 474 U.S. 15, 20,106 S.Ct. 292, 295.
[10] See State v. Fuller (Sept. 26, 1997), Hamilton App. No. C-960753, unreported.
[11] See id.
[12] See State v. Amill (Sept. 24, 1999), Mahoning App. No. 96 CA 48, unreported. Accord State v. Scott (Dec. 31, 1998), Sandusky App. No. S-98-022, unreported.
[13] Batson v. Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712.
[14] See id.
[15] See State v. White (1999), 85 Ohio St.3d 433, 437, 709 N.E.2d 140,148, certiorari denied (1999), 528 U.S. 938, 120 S.Ct. 345.
[16] See State v. Walker (2000), 139 Ohio App.3d 52, 56, 742 N.E.2d 1173,1176, citing Batson v. Kentucky at 96-98, 106 S.Ct. at 1722-1723.
[17] See Purkett v. Elem (1995), 514 U.S. 765, 767-768,115 S.Ct. 1769, 1771, quoting Hernandez v. New York (1991), 500 U.S. 352, 360,111 S.Ct. 1859, 1866.
[18] See State v. White at 436, 709 N.E.2d at 147.
[19] See Hernandez v. New York at 369, 111 S.Ct. at 1871.
[20] See State v. McClaney (June 30, 2000), Franklin App. No. 99AP-1035, unreported, citing Hernandez v. New York, supra, at 369,111 S.Ct. at 1871.
[21] See State v. Jones (Aug. 28, 1998), Hamilton App. No. C-970043, unreported, citing State v. Lott (1990), 51 Ohio St.3d 160, 555 N.E.2d 293;State v. Scott (June 25, 1997), Hamilton App. No. C-960557, unreported.
[22] See id., citing DR 7-106(C); State v. Maurer (1984),15 Ohio St.3d 239, 473 N.E.2d 768; State v. Smith (1984), 14 Ohio St.3d 13,470 N.E.2d 883.
[23] See id.
[24] See Civ.R. 52(B).
[25] See State v. Lane (1995), 108 Ohio App.3d 477, 482, 671 N.E.2d 272,275.
[26] See State v. Lane (1976), 49 Ohio St.2d 77, 86, 358 N.E.2d 1081,1089, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3148.
[27] State v. Hannah (1978), 54 Ohio St.2d 84, 374 N.E.2d 1359; Statev. Davie (1997), 80 Ohio St.3d 311, 331, 686 N.E.2d 245, 264
[28] See State v. Hannah at 93, 374 N.E.2d at 1365 (McCormac, J., dissenting).
[29] See State v. Montgomery (Mar. 29, 1996), Washington App. No. 94CA40, unreported.
[30] See State v. Davie at 331, 686 N.E.2d at 264; Jackson v. Howell
(1993), 86 Ohio App.3d 497, 500, 621 N.E.2d 573, 574-575, and cases cited therein; State v. Burbrink (May 8, 1985), Hamilton App. No. C-840574, unreported.
[31] See State v. Carter (Dec. 27, 1985), Columbiana App. No. 84-C-55, unreported, citing State v. Champion (1924), 109 Ohio St. 282, 289,142 N.E. 141, 143-144. Accord State v. Davie at 331,686 N.E.2d at 264.
[32] See Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052.
[33] See Cuyler v. Sullivan (1980), 446 U.S. 335, 347, 100 S.Ct. 1708,1718; State v. Manross (1988), 40 Ohio St.3d 180, 182, 532 N.E.2d 735,737.
[34] State v. Manross at 182, 532 N.E.2d at 737.
[35] See State v. Manross at 182, 532 N.E.2d at 738.
[36] See State v. Dillon (1995), 74 Ohio St.3d 166, 169, 657 N.E.2d 273,276, quoting Cuyler v. Sullivan at 356, 100 S.Ct. at 1722.
[37] See State v. Gillard (1997), 78 Ohio St.3d 548, 553, 679 N.E.2d 276,282.
[38] See State v. Manross at 182, 532 N.E.2d 738.
[39] See Evid.R. 101(C).
[40] See R.C. 2929.22. Accord State v. O'Dell (1989), 45 Ohio St.3d 140,543 N.E.2d 1220.