DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Justin Chapman, appeals from his convictions in the Lorain County Court of Common Pleas. This Court reverses.
 I. {¶ 2} On October 26, 2005, Appellant, Justin Chapman ("Chapman"), was indicted on the following charges: (1) murder, in violation of R.C.2903.02(B), a special felony, (2) attempted murder, in violation of R.C.2923.02(A)(2), a felony of the first degree, (3) felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree, (4) aggravated burglary, in violation of R.C. 2911.11(A)(1)/(2), a felony of the first degree, (5) aggravated robbery, in violation *Page 2 
of R.C. 2911.01(A)(1), a felony of the first degree, (6) possession of criminal tools, in violation of R.C. 2923.24(A), a felony of the fifth degree, (7) tampering with evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree, and (8) having a weapon while under disability, in violation of R.C. 2923.13(A)(2), a felony of the third degree.
 {¶ 3} On March 13, 2007, Chapman's case proceeded to trial before a jury. Several witnesses testified on behalf of the State. Chapman did not testify and presented no witnesses on his behalf. The following is a summary of some of the trial testimony offered by the State.
 {¶ 4} Julian Smith ("Smith") testified for the State regarding the incident that led to Chapman's convictions. Smith testified as follows. He is currently incarcerated at the Lorain County Jail. In April of 2005, Smith was 19 years old and was living in Lorain with his parents, his two siblings, his cousin, Chapman, and his close friend, Darren English ("English"). English was also 19 years old. Chapman was 14 years old at the time.
 {¶ 5} According to Smith, English proposed that he, Smith and Chapman rob a man named William Fiske ("Fiske"). Smith knew Fiske from having purchased marijuana from him. The plan involved going to Fiske's house, scaring him and taking drugs and money. Smith stated that Chapman agreed to the plan and that no one pressured him to go along with it. Smith confirmed that the three *Page 3 
young men wore masks and that all three had guns. Smith test fired his gun. He noted that the gun misfired a few times.
 {¶ 6} At approximately 11:00 p.m. on April 26, 2005, the three young men left the Smith home dressed in dark colors, carrying their face masks and their guns. They walked to a convenience store and then headed to Fiske's apartment. When they arrived, the young men put on their masks and drew their guns. The young men approached the door. English stood between Smith and Chapman. English knocked on the door. When Fiske answered the door, English rushed in and the other two young men followed. Smith and Chapman had their guns drawn; English did not. Fiske and English started fighting. The fight started in the kitchen and moved into the living room. While English and Fiske fought in the living room, Smith and Chapman remained in the kitchen. At one point, Smith heard a gunshot. He realized that Chapman had fired his gun. Smith then fired his gun at Fiske. He testified that he fired twice and that one of the shots was a misfire. Smith estimated that Chapman fired his gun four or five times.
 {¶ 7} Eventually, Smith and Chapman went outside. Shortly thereafter, English came running out. Chapman took off running. English and Smith followed after Smith helped free English from his tussle with Fiske. English stumbled as the young men ran. English thought his rib had been broken and that this injury was impeding his ability to run. The men tossed some of the clothing they had been wearing as well as their guns. Eventually, English collapsed. At *Page 4 
this point, English thought he was having an asthma attack. Ultimately, Smith contacted his parents who came to pick up the young men. Once they arrived back at Smith's parents' house, his mother performed CPR. English was non-responsive. Smith's dad called 911. When the paramedics arrived, they discovered that English had been shot in the shoulder. English ultimately died from the gunshot wound.
 {¶ 8} At some point, the police arrived at Smith's parents' home and placed both Smith and Chapman under arrest. The police then transported the two young men to the police station. Smith left six bullets in the police car. He testified that he had not reloaded his gun and that these bullets were in his pocket when he got into the police cruiser. Smith acknowledged that at first, he lied to the police about the events of April 26, 2005. He later told the police the truth.
 {¶ 9} Smith was charged with felony murder, attempted murder, felonious assault, aggravated robbery, aggravated burglary and tampering with evidence. Smith testified that he entered into a plea agreement whereby the felony murder charge was reduced to involuntary manslaughter and he pled guilty to all the charges. In addition, Smith testified that he agreed to give truthful testimony on behalf of the State against Chapman. As a result of Smith's plea agreement, the State recommended a 13 year prison sentence.
 {¶ 10} On cross-examination, Smith acknowledged that he told the police several lies including that when he first heard a shot during the scuffle between *Page 5 
Fiske and English, he did not know whether it came from Chapman's gun. He also told the police that he could have shot English in the process of shooting on the run. In addition, Smith testified that, pursuant to his plea agreement with the State, his testimony had to result in Chapman's conviction.
 {¶ 11} Smith also admitted on cross-examination that he loaded Chapman's gun before the young men left his parent's house that evening. He testified that when the young men left Fiske's house, Chapman ran in a different direction. He could not explain why, when police found Chapman's gun, the gun was fully loaded. Smith clarified that he only heard a gun shot and that he could not say with certainty that Chapman shot a gun on that evening. When asked whether Fiske had a gun, Smith stated "[n]ot that I know of, no." He admitted that it was dark in the apartment and that he did not see a gun in Fiske's hand. Smith did not see Fiske's girlfriend, Sumar Rush ("Rush"), that evening.
 {¶ 12} Smith stated that Chapman did not take extra ammunition with him that evening because Smith had given him his ammunition and he did not give him any extra ammunition. Smith testified that the only ammunition Chapman would have had was the ammunition Smith loaded into Chapman's gun before they left Smith's house.
 {¶ 13} Rush also testified for the State. At around 11:30 p.m. on April 26, 2005, Rush arrived at Fiske's Lorain apartment. Earlier in the day, she had dropped off their daughter with Fiske. When she later arrived at the apartment, *Page 6 
Rush walked to the main bedroom where Fiske slept. Fiske was awake when Rush arrived. At some point, Fiske left the room. Rush soon heard the side door open and what sounded like a scuffle. She then heard approximately three or four gunshots. She ran to get their daughter and waited in the bedroom until she heard the door close. After a minute or so, she heard Fiske cough. She then heard him talking on the phone. She walked into the kitchen where he was standing. She realized that Fiske was talking with a 911 operator when she heard him explain that he had been shot in the head. At that point, Rush grabbed the phone from Fiske. She then spoke with the 911 operator. Shortly thereafter, the police arrived followed by the paramedics. Rush later learned that Fiske had been shot in his back and in his arm. She explained that Fiske never had the bullets removed from his body.
 {¶ 14} Rush testified that she did not see any of the perpetrators that evening. She further testified that she did not fire a gun, nor did she handle a gun at any point that evening. Rush testified that the police gave her a gunshot residue test on April 25, 2006. She acknowledged that both of her hands tested positive for gunshot residue. Rush surmised that Fiske had gunshot residue on his person as a result of being shot and from interacting with the perpetrators. She opined that some of this gunshot residue was transferred to her hands when she took the phone from him. *Page 7 
 {¶ 15} Fiske testified that at around midnight on April 25, 2006, he heard someone tapping on his side door. He recognized this sound as a knock and went to answer the door. When Fiske opened the door, a person in a mask rushed at him. An altercation ensued. Eventually, Fiske attempted to push this perpetrator out the door. However, there were two other people standing in the doorway, blocking the door. At some point, the perpetrators began shooting at him. He was shot six times. After about five or ten minutes, the perpetrators left. Fiske then closed and locked his door and called 911.
 {¶ 16} Fiske testified that he did not see the perpetrators' faces because they were wearing masks. He noted that none of the perpetrators ever spoke to him. He also testified that although he had a nine millimeter handgun, he did not obtain it during the altercation. He further testified that he did not fire any shots that evening. He agreed that he did not give any of the perpetrators permission to enter his apartment.
 {¶ 17} Fiske testified that he sold marijuana. He acknowledged that he had sold marijuana to Smith and English. He testified that he knew English because his grandmother lived three houses from Fiske's apartment. Fiske further testified that he knew Chapman. He was not sure whether he had ever sold marijuana to Chapman. Fiske testified that the perpetrators did not take anything from his house. *Page 8 
 {¶ 18} Andrew Chappell, a forensic scientist with the Bureau of Criminal Investigation who specializes in firearms, also testified on behalf of the State. Chappell testified regarding his examination of the cartridges recovered from Fiske's house and the bullet recovered from English's body. Chappell testified on cross-examination that the bullet recovered from English's body "could have been" fired from Chapman's gun. He testified that he could not definitively determine whether the bullet recovered from English was fired from Chapman's gun.
 {¶ 19} On March 21, 2007, the jury returned a verdict, convicting Chapman on all counts and firearm specifications except the aggravated robbery count. Chapman was sentenced to an aggregate term of 35 years to life in prison. Chapman timely appealed, raising four assignments of error for our review.
 {¶ 20} We have rearranged Chapman's assignments of error to facilitate our review.
 II. ASSIGNMENT OF ERROR III "THE STATE OF OHIO COMMITTED PROSECUTORIAL MISCONDUCT AND DEPRIVED CHAPMAN OF A FAIR TRIAL WHEN THEY OFFERED CO-DEFENDANT JULIAN SMITH A CONSIDERABLY LESS SENTENCE IN A PLEA AGREEMENT IF SMITH'S TESTIMONY RESULTED IN A CONVICTION."
 {¶ 21} In Chapman's third assignment of error, he contends that the State committed prosecutorial misconduct and deprived him of a fair trial when they *Page 9 
offered his co-defendant, Smith, a considerably less severe sentence in a plea agreement if Smith's testimony resulted in a conviction. We agree.
 {¶ 22} In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a reviewing court determines if the prosecutor's actions were improper, and, if so, whether the substantial rights of the defendant were actually prejudiced. State v. Smith (1984),14 Ohio St.3d 13, 14. "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." State v. Knight, 9th Dist. No. 03CA008239,2004-Ohio-1227, at ¶ 6, citing State v. Carter (1995),72 Ohio St.3d 545, 557. The defendant must show that there is a reasonable probability that but for the prosecutor's misconduct, the result of the proceeding would have been different. State v. Loza (1994), 71 Ohio St.3d 61, 78, overruled on other grounds.
 {¶ 23} When the defendant fails to object to the purported acts of prosecutorial misconduct, he waives all but plain error. State v.Smith, 97 Ohio St.3d 367, 2002-Ohio-6659, at ¶ 45, citing State v.Slagle (1992), 65 Ohio St.3d 597, 604. As Chapman failed to object to the alleged prosecutorial misconduct, he has waived any claim of error but plain error. See Id.
 {¶ 24} Pursuant to Crim.R. 52(B), a plain error or defect that affects a substantial right may be noticed although it was not brought to the attention of the trial court. "A plain error must be obvious on the record, such that it should have been apparent to the trial court without objection." State v. Kobelka (Nov. 7, *Page 10 
2001), 9th Dist. No. 01CA007808, at *2, citing State v. Tichon (1995),102 Ohio App.3d 758, 767. As notice of plain error is to be taken with utmost caution and only to prevent a manifest miscarriage of justice, the decision of a trial court will not be reversed due to plain error unless the defendant has established that the outcome of the trial clearly would have been different but for the alleged error.Kobelka, supra, at *2, citing State v. Waddell (1996),75 Ohio St.3d 163, 166, and State v. Phillips (1995), 74 Ohio St.3d 72, 83.
 {¶ 25} In the present matter, Chapman maintains that the prosecutor erred by offering Smith a considerably less severe sentence in exchange for testimony that resulted in Chapman's conviction. Chapman contends that this offer provided a motivation for Smith to perjure himself at trial to secure the plea agreement.
 {¶ 26} While we recognize that Chapman did not argue plain error, we find that he has demonstrated why we should delve into this issue for the first time on appeal. See State v. Long (1978), 53 Ohio St.2d 91, 94
(explaining that the court may notice plain error on its own motion or at the request of counsel); In re L.A.B., 9th Dist. No. 23309,2007-Ohio-1479, at ¶ 19 (declining to address plain error because the appellant had neither argued it nor explained why we should examine the issue for the first time on appeal). Furthermore, as demonstrated below, Chapman brought this detail of the plea agreement to the trial court's attention through his cross-examination of Smith. *Page 11 
 {¶ 27} The record reflects that on cross-examination Smith testified regarding his plea agreement with the State:
 "Q: You made a deal with the Prosecutor's Office, correct?
 "A: Um-hum.
 "Q: To save yourself a significant prison sentence, correct?
 "A: Um-hum.
 "Q: And the significant prison sentence we're talking about is you were facing the maximum possible sentence of 51 years to life in prison, correct?
 "A: Um-hum.
 "Q: And your deal is you got a deal for 13 years in prison?
 "A: (Indicating affirmatively.)
 "Q: Straight?
 "A: Um-hum.
 "* * *
 "Q: And you had to do certain things to get that deal, didn't you?
 "A: Um-hum.
 "Q: One being you have to testify against 
Chapman, your cousin?
 "A: Um-hum.
 "Q: And your testimony has to result in a conviction?
 "[Prosecutor]: Objection.
 "The Court: He can still answer the question whether that is or is not part of it, so I'll overrule that. You may answer."
 "A: Yes. *Page 12 
 "Q: And the Prosecutor asked you a question on direct whether one of your conditions was that you had to give truthful testimony, correct?
 "A: Um-hum."
 The Prosecutor asked Smith about the plea agreement on re-direct:
 "Q: Your deal, if you will, is to testify truthfully; is that accurate?
 "A: Um-hum.
 "Q: Who makes the decision on whether or not the Defendant is guilty or not guilty?
 "A: I guess the jury.
 "Q: So the State doesn't make that decision?"
 {¶ 28} We note at the outset that Smith's plea agreement is not in the record. However, the State has not refuted Smith's testimony on cross-examination that one of the conditions of his plea agreement was that his testimony had to result in a conviction. The State had the opportunity to clarify the terms of the plea agreement on re-direct, yet the record reflects that the State did not question Smith about his statement on cross-examination that, pursuant to his plea agreement, his testimony had to result in Chapman's conviction. Rather, the State merely reiterated that Smith had to testify truthfully. The State has likewise not challenged this testimony on appeal.
 {¶ 29} The analysis engaged in by the Eighth Circuit Court of Appeals in U.S. v. Waterman (C.A.8, 1984), 732 F.2d 1527, provides guidance for our analysis of the propriety of the plea agreement. InWaterman, the Eighth Circuit, *Page 13 
sitting en banc, examined the district court's decision denying Waterman's motion to vacate his sentence for a due process violation. The alleged due process violation arose out of the government's agreement with its key witness to recommend reduction of sentence if the witness' cooperation led to further indictments.
 {¶ 30} While the Waterman court noted that an agreement granting favors to government witnesses in return for truthful testimony is not per se illegal, the court reasoned that the agreement involved in the case before it was different. Id. at 1531. The Eighth Circuit explained that "the government cannot consistent with due process offer favorable treatment to a prosecution witness contingent upon the success of the prosecution. Such an agreement is nothing more than an invitation to perjury having no place in our constitutional system of justice." Id.
 {¶ 31} The Waterman court refuted the government's contention that the jury is able to decide the credibility of the witnesses and that Waterman was not prejudiced by this witness' testimony. The court explained:
 "we cannot accept the argument that the jury, which was given notice of the contingency agreement, could legitimate this contingency agreement by deciding for itself whether Gamst [the key witness] was testifying truthfully. This is not the case where a defendant who thoroughly attacks a witness' credibility on cross-examination might therefore be unable to show prejudice in the government's failure to disclose a non-contingency immunity agreement with that witness. This case involves not the undisclosed possibility of bias, but the disclosed encouragement and reward of bias. * * * More fundamentally, however, we see no place in due process law for positioning the jury to weed out the seeds of untruth planted by the government. Certainly Gamst might have lied *Page 14 
regardless of the contingency agreement and the jury was generally commissioned to determine the truth of his testimony; but that is no reason for the government to give him further incentive to selectively remember past events in a manner favorable to the indictment or conviction of others." (Internal citations omitted.) Id. at 1531-32
 {¶ 32} Finally, the Waterman court explained that in light of its decision that the contingency agreement violated due process requirements, it could not accept the government's contention that Waterman was not prejudiced by the violation. Id. at 1532. The court further explained that "[although we noted on direct appeal that evidence independent of Gamst's testimony supported Waterman's convictions on the four counts which we affirmed, * * * the independent evidence was not so overwhelming that the erroneous admission of Gamst's testimony could for this reason be labeled harmless." Waterman,732 F.2d at 1532.[1]
 {¶ 33} Upon review, we find that the prosecutor's conduct in the within matter rises to the level of prosecutorial misconduct. We find that Smith's contingency agreement with the State violated Chapman's due process rights. The plea agreement which, according to Smith, afforded him a reduction in his sentence from, at most, 51 years to 13 years if he testified truthfully and the jury *Page 15 
convicted Chapman motivated Smith to commit perjury or at the least, "to selectively remember past events in a manner favorable to the indictment or conviction of [Chapman]." Id. at 1532. See Smith,14 Ohio St.3d at 14. This agreement deprived Chapman of a fair trial, even absent a specific showing of perjured testimony. Knight, supra, at ¶ 6. Smith was one of the State's key witnesses and the only witness who could place Chapman at the scene of the crime, place the gun in his hand, and describe the shooting and the escape. Given this fact, there is a reasonable probability that, but for the prosecutor's misconduct, Smith may have provided different testimony (or none at all) and the result of the proceeding may have been different. Loza, 71 Ohio St.3d at 78.
 {¶ 34} We find further support for our conclusion in several other state court decisions. See Sheriff, Humboldt Cty. v. Acuna (1991), 107 Nev. 664, 669 (finding that "the State may not bargain for testimony so particularized that it amounts to following a script, or require that the testimony produce a specific result"); State v. DeWitt (Iowa 1979),286 N.W.2d 379, 384 (explaining that "[i]t is equally apparent that where the prosecutor * * * bargains with an accomplice for * * * a specific result, the accomplice's subsequent testimony is tainted and inadmissible"). See also U.S. v. Dailey (C.A. 1,1985), 759 F.2d 192, 201
and fn. 9 (explaining "we can think of no instance in which the government would be justified in making a promised benefit contingent upon the return of an indictment or a guilty verdict" and explaining that, although the agreement at issue in Dailey *Page 16 
did not make a promised benefit contingent upon an indictment or a conviction, such an agreement may cross the limits imposed by the due process clause).
 {¶ 35} In sum, we agree with the Eighth Circuit's conclusion "that due process cannot be interpreted to allow the government to reward its witnesses based upon the results of their testimony. There simply is no reason to offer a witness favorable treatment for anything other than truthful cooperation in the government's quest for justice."Waterman, 732 F.2d at 1533. Based on the State's heavy reliance on Smith's testimony and the invitation to Smith to commit perjury and/or selectively remember details from the incident, we find that the prosecutor's actions constitute plain error, requiring reversal.Kobelka, supra, at *2. See State v. Davis, 9th Dist. No. 22395,2005-Ohio-4083, at ¶ 21 (finding plain error where trial court failed to instruct jury that it was to weigh accomplice testimony with great caution where State heavily relied on accomplice testimony, there was no other testimony identifying the appellant, and no physical evidence linking the appellant to the crime). Accordingly, Chapman's third assignment of error is sustained.
 ASSIGNMENT OF ERROR I "[CHAPMAN'S] CONVICTION OF MURDER AND ATTEMPTED MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 ASSIGNMENT OF ERROR II "DEFENSE COUNSEL ERRED AND PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE DID NOT OBJECT *Page 17 
AND ALLOWED THE STATEMENT THAT CHAPMAN HAD MADE TO THE LORAIN POLICE DEPARTMENT (LPD) TO BE INTRODUCED AT TRIAL AND ADMITTED INTO EVIDENCE."
 ASSIGNMENT OF ERROR IV "CHAPMAN'S THIRTY-FIVE TO LIFE SENTENCE VIOLATED HIS RIGHTS TO DUE PROCESS AS CHAPMAN WAS OFFERED THE MINIMUM SENTENCE OF EIGHTEEN TO LIFE AT THE FINAL PRE-TRIAL AND SHOULD NOT HAVE BEEN PUNISHED SO SEVERELY FOR `FAILING TO TAKE RESPONSIBILITY'."
 {¶ 36} In light of our disposition of Chapman's third assignment of error, Chapman's first, second and fourth assignments of error are rendered moot.
 III. {¶ 37} Chapman's third assignment of error is sustained. Chapman's first, second and fourth assignments of error are moot. The judgment of the Lorain County Court of Common Pleas is reversed and the cause is remanded for a new trial.
Judgment reversed, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into *Page 18 
execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellee.
DICKINSON, J. CONCURS
[1] The equally divided Eighth Circuit en banc panel ultimately affirmed the district court. Accordingly, this case has no precedential value. It does, however, set forth sound reasoning for analysis of the plea agreement undergirding the testimony of the State's key witness in this case.