The STATE of Ohio, Appellee,

v.

CHAPMAN, Appellant.

[Cite as *State v. Chapman*, 190 Ohio App.3d 528, 2010-Ohio-5924.]

Court of Appeals of Ohio,
Ninth District, Lorain County.

No. 09CA009672.

Decided Dec. 6, 2010.

530

Dennis Will, Lorain County Prosecuting Attorney, and Mary R. Slanczka, Assistant Prosecuting Attorney, for appellee.

Kenneth N. Ortner, for appellant.

_____

DICKINSON, Presiding Judge.

## INTRODUCTION

{¶ 1} Fourteen-year-old Justin Chapman, 19–year–old Darren English, and 19–year–old Julian Smith were hanging out one evening at Smith's house when they decided to rob William Fiske so that English could buy diapers for his son. During the robbery, English was shot. He died from internal bleeding within an hour. The grand jury indicted Chapman for murder, attempted murder, felonious assault, aggravated burglary, aggravated robbery, possession of criminal tools, tampering with evidence, and having weapons while under disability. A jury convicted him of each offense, and the trial court sentenced him to 38 years to life in prison. This court reversed his convictions, but the state retried him, and a jury convicted him again on each count. The trial court sentenced him to 30 years in prison. Chapman has appealed, arguing that the juvenile court incorrectly bound him over so that he could be tried as an adult, that his mother should have been informed that she had a right to an attorney before she advised him on how to proceed with questioning, that the trial court incorrectly let Smith testify at trial, that the court improperly sentenced him to a longer prison term because he exercised his right to a jury trial, that his case should have been retried before a different judge, that there was insufficient evidence to convict him of murder, that his conviction for murder is against the manifest weight of the evidence, that the trial court incorrectly let the prosecution excuse the only African–American juror on the panel, and that allowing his mother to take part in the interrogation was an unfair inducement. We affirm Chapman's convictions because his arguments about the juvenile court and the police interrogation are barred by the doctrine of law of the case, the trial court correctly let Smith testify, this court does not have the authority to determine whether the trial judge was impartial, his murder conviction is supported by sufficient evidence and is not against the manifest weight of the evidence, and the prosecution had a racially neutral explanation for using a peremptory challenge on the African–American juror. We vacate Chapman's sentence, however, because the trial court's statements created the appearance that it sentenced him to a longer prison term for exercising his right to a jury trial.

## FACTS

{¶ 2} After deciding to rob Fiske, Smith, English, and Chapman test-fired a couple of revolvers and crafted masks out of the sleeves of sweatshirts. Sometime after 11:00 p.m., they walked to Fiske's house. When they got to the house, they put on their masks, rang the doorbell, and waited for Fiske to answer. When Fiske opened the door, they rushed into the house, English leading because he was the biggest. English began struggling with Fiske in the entryway and throughout the living room of the house. Smith and Chapman entered the house and began watching the struggle from the kitchen. As English and Fiske continued tussling, Chapman shot at Fiske. Hearing gunshots, Smith also shot at Fiske, but most of his bullets misfired.

{¶ 3} Despite having been shot multiple times in the back, Fiske muscled English back to the door the men had entered through. Chapman and Smith, therefore, decided to flee. After being forced out of the house, English also attempted to flee, but Fiske grabbed him. Realizing that English needed help, Smith ran back to the house and hit Fiske in the head with his revolver, causing Fiske to lose his grip on English. Smith and English began running back to Smith's house, but English had to stop because he was having trouble breathing. Thinking it was his asthma acting up, English asked Smith to call his family to ask for a ride. He did not want to call 911 because there was a warrant outstanding for him.

{¶ 4} Smith used a cell phone to call home and got his brother, who agreed to pick them up. While the brother was driving to their location, however, he was stopped by the police and told to go back home because he had a suspended license. When the brother did not show up after 15 to 20 minutes, Smith called home again. This time, he got his parents, who agreed to pick them up. By the time Smith's parents arrived, English was close to death. By the time they got back to the Smiths' house, English was not breathing. Smith's mother began doing CPR, and Smith's father called 911.

{¶ 5} When the paramedics arrived, they opened English's shirt and discovered that he had been shot. They were unable to resuscitate him. At some point, Chapman returned to the Smiths' house. The police detained him and later, with his mother present, questioned him about what had happened. During the interrogation, he told them where to find a gun. Analysis revealed that the bullet that caused English's wound was fired from the gun Chapman told them about.

## LAW OF THE CASE

{¶ 6} Chapman's first assignment of error is that the juvenile court incorrectly transferred his case to the common pleas court. His second assignment of error

is that his mother should have been told that she had the right to an attorney before advising him how to proceed with the police interrogation. His ninth assignment of error is that the police unfairly induced him by allowing his mother to talk to him during the interrogation. These assignments of error are barred by the doctrine of law of the case.

{¶ 7} The doctrine of law of the case "provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 3, 11 OBR 1, 462 N.E.2d 410. It "precludes a litigant from attempting to rely on arguments at a retrial [that] were fully pursued, or available to be pursued, in a first appeal. New arguments are subject to issue preclusion, and are barred." *Hubbard ex rel. Creed v. Sauline* (1996), 74 Ohio St.3d 402, 404–405, 659 N.E.2d 781.

{¶ 8} Chapman's arguments regarding his transfer from juvenile court and his mother's participation during his police interrogation could have been raised in his first appeal. Because he did not raise them in that appeal, they "are subject to issue preclusion, and are barred." *Sauline,* 74 Ohio St.3d at 405, 659 N.E.2d 781. Chapman's first, second, and ninth assignments of error are overruled.

## IMPARTIALITY

{¶ 9} Chapman's fifth assignment of error is that his case should have been retried before a different judge because the same judge could not have been impartial because he had already heard the case. While Chapman did not raise this issue before his second trial, he has argued that it amounts to plain error. See Crim. R. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the [trial] court").

{¶ 10} Although Crim.R. 52(B) permits appellate courts to take notice of plain errors, such notice is to be taken "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 97, 7 O.O.3d 178, 372 N.E.2d 804. In order to prevail on a claim of plain error, the defendant must show that "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Murphy* (2001), 91 Ohio St.3d 516, 532, 747 N.E.2d 765, quoting *State v. Campbell* (1994), 69 Ohio St.3d 38, 41, 630 N.E.2d 339.

{¶ 11} This court has held that "[a] court of appeals is without authority to pass upon disqualification [of a trial judge] or to void the judgment of the trial court upon that basis." *State v. Davie* (Mar. 10, 1999), 9th Dist. No. 19088, 1999 WL 157412, at *5, quoting *State v. Ramos* (1993), 88 Ohio App.3d 394, 398, 623 N.E.2d

1336. Rather, "Section 2701.03 of the Ohio Revised Code provides the procedures that [Chapman] should have followed to disqualify the trial judge." Id. Accordingly, "[t]his Court has no authority to grant him the relief he has requested." Id. Chapman's fifth assignment of error is overruled.

## PEREMPTORY CHALLENGE

{¶ 12} Chapman's eighth assignment of error is that the trial court incorrectly allowed the state to excuse the only African–American juror on the panel. He has argued that the state failed to establish that it had a race-neutral explanation for using a peremptory challenge on the juror.

{¶ 13} "The Equal Protection Clause of the United States Constitution prohibits deliberate discrimination based on race by a prosecutor in his exercise of peremptory challenges." *State v. Campbell*, 9th Dist. No. 24668, 2010-Ohio-2573, 2010 WL 2298570, at ¶ 33, citing *Batson v. Kentucky* (1986), 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69. " ' "A court adjudicates a *Batson* claim in three steps." ' " *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 61, quoting *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, at ¶ 106, quoting *State v. Murphy* (2001), 91 Ohio St.3d 516, 528, 747 N.E.2d 765. " 'First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge.' " Id., quoting *Bryan* at ¶ 106. " 'Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination.' " Id., quoting *Bryan* at ¶ 106. "A facially neutral reason for a strike may indicate discrimination, if the state uses it only to eliminate jurors of a particular cognizable group." *Murphy*, 91 Ohio St.3d at 529, 747 N.E.2d 765.

{¶ 14} During voir dire, the prosecutor told the jurors that they would have to assess the credibility of the witnesses. She explained that being in a courtroom did not mean that they must leave their common sense behind, and that they should use the same skills they use in everyday life to determine whether someone is telling the truth. The prosecutor then asked the African–American juror how she would assess whether someone she was talking to was telling the truth. The juror replied that she would base her decision on "[w]hat they say and [whether] the evidence matches what they say." The prosecutor told the juror, "Well, take out the idea of evidence. Say you and I are out on the street and I start telling you a story about something that happened to me last night. What would you be looking at? What would you – how would you tell if I was telling you the truth? What are some of the things you would think about or consider?" The juror replied, "Just if your story sounds correct." The prosecutor asked her "[w]hether it makes sense, right?" and the juror responded, "Um-

hum." The prosecutor further asked her "[w]hether it fits. If it sounds outrageous, it may not be so true, that kind of thing[?]" The juror answered, "Yeah." The prosecutor moved on to another juror who answered that she would pay attention to the other person's body language, eye contact, and whether their story was internally consistent.

{¶ 15} Later, when the prosecutor asked whether any of the jurors had seen anything about Chapman's case in the media, the African–American juror indicated that she had. Although the juror believed that she would be able to set aside everything that she had learned about the case, she admitted that she had formed an opinion about the case based on what she had read.

{¶ 16} The prosecutor gave two reasons for using a peremptory challenge on the African–American juror. The prosecutor said, "I had asked her a question about being out on the street and you and I were meeting and assessing my credibility, and she started talking about the evidence. I'd have to assess the evidence. It did not seem an appropriate response to the question which was clearly not in the context of testimony." According to the prosecutor, the juror's answer says that "she was either not listening or didn't understand or was not paying attention to what was going on." The prosecutor then gave a second reason for excusing the juror: "[W]hen I inquired into media, she appeared to me to be rather evasive regarding whether or not she had formed an opinion based on that media attention and whether or not that media attention would influence her in her decision-making process." The prosecutor summarized that her reason for using a challenge on the juror "had everything to do with her attention to detail and how she's going to be able to assess the evidence given her prior knowledge. She was very evasive in the media question about whether that might sway her and whether or not she would be able to set that aside." Courts have determined that juror inattentiveness and media exposure are valid race-neutral reasons for using a peremptory challenge. See *State v. Gray* (June 30, 1998), 7th Dist. No. 94 CA 5, 1998 WL 355849, at *5 (juror inattentiveness was a "valid and neutral" reason for wanting to exclude juror); *State v. McCrae* (Apr. 27, 1987), 5th Dist. No. CA–6943, 1987 WL 11058, at *3 (prosecution properly struck juror who had been "exposed to some pretrial publicity via the newspapers").

{¶ 17} Regarding the final step of the analysis, the trial court concluded that the prosecutor did not use her challenge for a racially discriminatory reason. It explained that even if a witness professes a willingness to abide by instructions "after indicating some either equivocation or some potential impact on their consideration of the case based [on] some prior experience * * * that doesn't necessarily preclude a counsel from still being concerned about the fact that that

prospective juror may have that in the back of their mind in making their deliberations."

{¶ 18} Because the trial court's evaluation of the ultimate question of discriminatory motive "turns largely 'on evaluation of credibility,' " it is entitled to deference. *Murphy*, 91 Ohio St.3d at 530, 747 N.E.2d 765, quoting *State v. White* (1999), 85 Ohio St.3d 433, 437, 709 N.E.2d 140. It appears from the record that the prosecutor incorrectly recalled the order of the African–American juror's answers to her credibility questions. The juror actually made her statement about having to assess the evidence before the prosecutor asked her what she would do if she met her on the street. Chapman, however, did not bring the mistake to the trial court's attention, and the prosecutor had at least one other race-neutral reason for excluding the juror. We have reviewed the record and conclude that there is no evidence of discriminatory intent. See id. Chapman's eighth assignment of error is overruled.

## SMITH'S TESTIMONY

{¶ 19} Chapman's third assignment of error is that the trial court incorrectly let Smith testify even though this court determined that the trial court had improperly admitted his testimony at the first trial. Chapman has argued that the trial court's decision to let Smith testify violated his right to a fair trial.

{¶ 20} At Chapman's first trial, Smith testified that the state had agreed to reduce his prison sentence from 51 to 13 years if his testimony resulted in Chapman's conviction. This court concluded that Smith's plea agreement, as described by Smith, violated Chapman's right to a fair trial. This court noted that prosecutors may not " 'offer favorable treatment to a prosecution witness contingent upon the success of the prosecution * * * [because] [s]uch an agreement is nothing more than an invitation to perjury.' " *State v. Chapman*, 9th Dist. No. 07CA009161, 2008-Ohio-1452, 2008 WL 834423, at ¶ 30, quoting *United States v. Waterman* (C.A.8, 1984), 732 F.2d 1527, 1531. It determined that "[t]he plea agreement * * * motivated Smith to commit perjury or at the least, 'to selectively remember past events in a manner favorable to the indictment or conviction of [Chapman].' " Id. at ¶ 33, quoting *Waterman* at 1532. This court concluded that in light of the state's heavy reliance on Smith's testimony, the prosecutor's decision to reward Smith based on the result of his testimony was plain error, requiring reversal. Id. at ¶ 35.

{¶ 21} In its opinion, this court noted that Smith's plea agreement was not part of the record. *State v. Chapman*, 9th Dist. No. 07CA009161, 2008-Ohio-1452, 2008 WL 834423, at ¶ 28. It also noted that the state did not refute Smith's testimony that one of the conditions of his plea was that his testimony had to

result in a conviction. Id. It further noted that the state had not challenged Smith's testimony on appeal. Id. At Chapman's second trial, however, the state presented a copy of Smith's plea agreement, which provided that in exchange for a reduction in the charges against him, Smith would provide accurate information about the robbery and "cooperate in the prosecution of Justin Chapman." The plea agreement does not contain any language suggesting that it is contingent on Chapman's conviction. Smith also testified that the deal was not "in any way dependent upon what a jury would decide in [Chapman's] case." Chapman did not impeach him with his testimony from the first trial. Accordingly, because the state demonstrated that Smith's plea agreement was not contingent on Chapman's being convicted, the trial court did not deny Chapman's right to a fair trial by letting Smith testify. See *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 3, 11 OBR 1, 462 N.E.2d 410 (the doctrine of law of the case applies on retrial only if the trial court "is confronted with substantially the same facts * * * as were involved in the prior appeal"). Chapman's third assignment of error is overruled.

## MURDER CONVICTION

{¶ 22} Chapman's sixth assignment of error is that there was insufficient evidence to convict him of murder. His seventh assignment of error is that his murder conviction is against the manifest weight of the evidence. Whether a conviction is supported by sufficient evidence is a question of law that this court reviews de novo. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541; *State v. West,* 9th Dist. No. 04CA008554, 2005-Ohio-990, 2005 WL 544820, at ¶ 33. We must determine whether, viewing the evidence in a light most favorable to the prosecution, the average finder of fact could have been convinced of his guilt beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. When a defendant argues that his convictions are against the manifest weight of the evidence, however, we "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction[s] must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, 340, 515 N.E.2d 1009.

{¶ 23} Chapman has not disputed that he fired the bullet that entered English's chest cavity. He has argued, however, that he was not the proximate cause of English's death. According to Chapman, English lived for at least 30 minutes after getting shot and made a conscious decision not to get emergency medical treatment, even though he was having difficulty breathing, because he was afraid of being arrested.

{¶ 24} Under R.C. 2903.02(B), "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." "[D]eath is the 'proximate result' of Defendant's conduct in committing the underlying felony offense * * * [if it is] a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience." *State v. Dixon* (Feb. 8, 2002), 2d Dist. No. 18582, 2002 WL 191582, at *5; see *State v. Lovelace* (1999), 137 Ohio App.3d 206, 215, 738 N.E.2d 418 (describing general rule for proximate cause). "[Section 2903.02(B)] does not provide that the defendant * * * must be the immediate cause of death * * *." *State v. Ford,* 10th Dist. No. 07AP–803, 2008-Ohio-4373, 2008 WL 3970913, at ¶ 32.

{¶ 25} The coroner testified that English died from exsanguination due to a gunshot wound to his chest. He explained that the bullet passed through one of English's lungs and went into English's heart, causing blood to flow into English's chest cavity. The loss of pressure to English's circulatory system eventually prevented his heart from pumping blood to his other organs.

{¶ 26} The coroner's testimony established that English's death was a direct, natural, and reasonably foreseeable consequence of the perforation that the bullet created when it entered English's heart. We, therefore, conclude that there was sufficient evidence to support Chapman's conviction for murder under R.C. 2903.02(B).

{¶ 27} Chapman has not pointed to any evidence in the record suggesting that English refused to seek medical treatment despite knowing that he had been shot. There is also no evidence in the record suggesting that English would not have died from the gunshot wound if he had sought medical treatment sooner. Accordingly, we conclude that the jury did not lose its way when it determined that English's death was a proximate result of Chapman's conduct. Chapman's sixth and seventh assignments of errors are overruled.

## INCREASED SENTENCE

{¶ 28} Chapman's fourth assignment of error is that the trial court incorrectly sentenced him to a longer prison term for exercising his right to a jury trial. He has noted that before his second trial began, the trial court told him that if he pleaded guilty to the charges, the court was "of the mind-set that it was going to issue a sentence" of 21 years to life. It also told him that his sentence would "certainly not * * * be anything close to 21 to life if we don't get the resolution prior to the selection of the jury." After trial, the court sentenced Chapman to 30 years to life.

{¶ 29} Chapman has argued that the practice of giving longer sentences to defendants who proceed to trial has a "chilling effect" on their constitutional rights. The Ohio Supreme Court has written that "a defendant is guaranteed the right to a trial and should never be punished for exercising that right or for refusing to enter a plea agreement * * *." *State v. O'Dell* (1989), 45 Ohio St.3d 140, 543 N.E.2d 1220, paragraph two of the syllabus. "Any increase in the sentence based upon the defendant's decision to stand on his right to put the government to its proof rather than plead guilty is improper." *State v. Morris,* 159 Ohio App.3d 775, 2005-Ohio-962, 825 N.E.2d 637, at ¶ 12. "If courts could punish defendants for exercising their constitutional right to a jury trial, the right would be impaired by the chilling effect." Id. "This prohibition on increased punishment applies 'no matter how overwhelming the evidence of [defendant's] guilt.'" Id., quoting *State v. Scalf* (1998), 126 Ohio App.3d 614, 621, 710 N.E.2d 1206.

{¶ 30} "[A] court must avoid creating the appearance that it enhanced a defendant's sentence because he elected to go to trial." *State v. Morris,* 159 Ohio App.3d 775, 2005-Ohio-962, 825 N.E.2d 637, at ¶ 13. "[If] the court makes statements that 'give rise to the inference that [the] defendant may have been punished more severely because of his assertion of the right to trial by jury,' we must vacate the sentence * * * unless the record also contains an unequivocal statement that the defendant's decision to go to trial was not considered in imposing the sentence." Id., quoting *State v. Hobbs,* 8th Dist. No. 81533, 2003-Ohio-4338, 2003 WL 21954778, at ¶ 71. "'Absent such an unequivocal statement, the sentence will be reversed and the matter remanded for resentencing.'" Id., quoting *State v. Scalf* (1998), 126 Ohio App.3d 614, 621, 710 N.E.2d 1206.

{¶ 31} By telling Chapman that his sentence would "certainly not * * * be anything close to 21 to life if we don't get th[is] resol[ved] prior to the selection of the jury," the trial court created the appearance that it would punish Chapman more severely for exercising his right to a jury trial. Its statements at Chapman's sentencing hearing furthered that impression. The trial court told Chapman that part of its consideration in determining the length of his prison term was "how [he] reacted to these circumstances * * * not on the day of the offense, but what's transpired since that time." The court noted, "It's my understanding * * * that an offer was made by the State of Ohio to treat you as a juvenile." If added, "[Y]ou were advised by two different attorneys to accept that proposal as a reasonable and appropriate sanction with regard to this matter; and then that was not accepted." It noted that Chapman rejected an offer of 20 years in prison before his first trial and that he rejected an offer of 21 years to life before his second trial. The court told Chapman, "I appreciate that nobody wants to agree to seven years in prison. Nobody wants to agree to 20

years in prison. And nobody wants to agree to 21 years to life in prison. But it still is a consideration from this Court's perspective, in light of what amount of time is necessary and appropriate to rehabilitate someone who emptied their gun into the back of another individual, killed the second individual; and, then, given opportunities to admit wrong and to move forward in that regard and begin the rehabilitation, did not. And so those are all taken into consideration in this Court's determination as to the appropriate sanction with regard to these charges."

{¶ 32} The trial court did not unequivocally state that it had not considered Chapman's decision to go to trial in imposing his sentence. In fact, it appeared to sentence Chapman to a longer sentence because he went to trial instead of accepting one of the plea deals offered by the state. We therefore conclude that because the trial court's statements created the appearance that it was punishing Chapman for exercising his constitutional right to a jury trial, his sentence must be vacated. See *Morris*, 159 Ohio App.3d 775, 2005-Ohio-962, 825 N.E.2d 637, at ¶ 12–13. Chapman's fourth assignment of error is sustained.

## CONCLUSION

{¶ 33} Chapman's arguments about the juvenile court and his mother's participation in the police interrogation are barred by the doctrine of law of the case, the trial court correctly let Smith testify at Chapman's second trial, we do not have the authority to determine whether the trial judge was impartial, Chapman's murder conviction is supported by sufficient evidence and is not against the manifest weight of the evidence, and the prosecution had a racially neutral explanation for using a peremptory challenge on the lone African–American juror. The trial court, however, improperly appeared to sentence Chapman to a longer prison term for exercising his right to a jury trial. The judgment of the Lorain County Common Pleas Court is affirmed in part and reversed in part, and this matter is remanded for a new sentencing hearing.

Judgment affirmed in part
and reversed in part,
and cause remanded.

WHITMORE and MOORE, JJ., concur.